Amadou SALL, Petitioner,

v.

Alberto GONZALES, Attorney General
of the United States,* Respondent.

Docket No. 03–4840.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 30, 2006.

Decided: Feb. 3, 2006.

*See Latifi v. Gonzales,* 430 F.3d 103, 106 n. 1 (2d Cir.2005).

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto Gonzales is substituted for his predecessor, Attorney General John Ashcroft, as the respondent in this case.

Ronald S. Salomon, New York, NY, for Petitioner.

Damian W. Wilmot, Assistant United States Attorney (Michael J. Sullivan, United States Attorney for the District of Massachusetts, on the brief), United States Attorney's Office for the District of Massachusetts, Boston, MA, for Respondent.

Before: WINTER, CABRANES, and B.D. PARKER, Circuit Judges.

PER CURIAM.

We consider here the proper standards for reviewing a finding by an immigration judge ("IJ") that an asylum applicant has "firmly resettled" in a third country before applying for asylum in the United States. See 8 C.F.R. § 208.15 (defining aliens who have "firmly resettled"); 8 U.S.C. § 1158(b)(2)(A)(vi) (barring such aliens from receiving asylum).

Petitioner Amadou Sall, who claims to be a native and citizen of Mauritania, petitions for review of an April 8, 2003 order of the Board of Immigration Appeals ("BIA") affirming without opinion an October 16, 1997 decision of IJ Joanna Miller Bukszpan denying him asylum and withholding of deportation[1] under the Immi-

---

1. The procedure called "withholding of deportation" at the time the IJ issued her decision is now referred to as "withholding of removal." See 8 C.F.R. § 208.16.

gration and Nationality Act of 1952, as amended, 8 U.S.C. § 1101 *et seq.* ("INA"). The IJ concluded that Sall had "firmly resettled" in a third country before applying for asylum in the United States and therefore was ineligible for asylum. He concluded as well that even if Sall were not barred from receiving asylum by the "firmly resettled" rule, he nonetheless did not meet the requirements for a grant of asylum because (1) he failed to demonstrate either past persecution or a well-founded fear of future persecution and (2) changed conditions in Mauritania permit Sall's safe return. Sall contests each of these findings.

The following facts are drawn from Sall's application for asylum and his testimony before the IJ. Sall was born in Mauritania and lived with his family near the river demarcating the border with Senegal. He supported himself by farming and herding. At the time relevant to this case, petitioner described Mauritania as being run by "white Moors" who were hostile to black persons such as Sall and his family. After various incidents of abuse, "white Moor" military men came to Sall's home in 1989, confiscated the family's identification documents, and informed Sall and his family that because they were black, they "were not Mauritanians" and must leave the country. The soldiers then took away Sall's brothers, who had argued with them. Sall later learned that his brothers had likely been killed. Meanwhile, soldiers separated Sall from his parents, briefly imprisoned him, and then forced him and about thirty others at gunpoint to cross into Senegal.

In Senegal he was met by Red Cross workers, who took him to a refugee camp where he was reunited with his parents.[2] Although the Red Cross provided some food, Sall and other young men performed odd jobs to help make ends meet. Residents slept in tents. He stayed at the refugee camp for about four-and-one-half years, during which time he was listed on his father's "card."[3] Dissatisfied with conditions at the camp, Sall eventually secured a ride to Dakar, the capital of Senegal, where he helped unload and carry goods for tips. After nine months in Dakar, Sall paid someone to transport him to the United States, where he arrived in March 1995 and entered without inspection.

After being served a notice to appear by the Immigration and Naturalization Service ("INS"),[4] Sall conceded deportability and applied for asylum, withholding of removal, and, in the alternative, voluntary departure. To support his claims, Sall testified and provided documents such as country reports and newspaper accounts of the situation of blacks in Mauritania, a letter Sall alleged to be from the Saint–Louis regional president of the Senegal Red Cross confirming Sall's presence at the Thilogne refugee camp, and a letter Sall alleged to be from his mother describing the refugee camp's difficult conditions.

**2.** Although the hearing transcript identifies the camp's location as "Chilogne," the decision of the IJ, as well as maps of Senegal, suggest that the correct spelling is "Thilogne."

**3.** Camp residents presented such cards to prove their status as refugees and to obtain food.

**4.** On March 1, 2003, the Immigration and Naturalization Service was reconstituted as the Bureau of Immigration and Customs Enforcement and the Bureau of U.S. Citizenship and Immigration Services, both within the Department of Homeland Security. Because the rulings at issue in this case were made when the agency was still the INS, we refer to it as the INS in this opinion. *See Monter v. Gonzales,* 430 F.3d 546, 548 n. 1 (2d Cir. 2005).

In addition, Sall submitted a letter from the United Nations High Commissioner for Refugees ("UNHCR") stating that UNHCR Senegal had no record of Sall or his parents.

After reviewing this evidence, the IJ first found that Sall was ineligible for asylum because he had been "firmly resettled" in Senegal before applying for asylum in the United States. She based this conclusion on findings that Sall had lived in Senegal for about five years "and was clearly under no impediments to work or to travel within the country."

Second, although a finding of "firm resettlement" precludes a grant of asylum, *see* 8 C.F.R. § 208.15, the IJ found in the alternative that Sall had not demonstrated a well-founded fear of persecution and therefore did not meet the definition of a "refugee." Her conclusion was based on findings that the UNHCR "is the authority involved in the refugee camps" for Mauritanian refugees in Senegal and that the Red Cross letter had "limited probative value." She also found that she could not verify the legitimacy of the letter Sall said was from his mother. Based on these findings, the IJ found that Sall did not meet his burden of showing a well-founded fear of persecution.

Accordingly, the IJ denied Sall's application for asylum and withholding of deportation. The BIA affirmed without opinion, and this petition for review followed.

## I. Standard for "Firm Resettlement" Findings

■ In general, we review an IJ's findings of fact for "substantial evidence," *see, e.g., Yun–Zui Guan v. Gonzales,* 432 F.3d 391, 394 (2d Cir.2005), and the "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We agree with the conclusion of our sister circuits that the "substantial evidence" standard applies when reviewing findings of firm resettlement. *See, e.g., Nahrvani v. Gonzales,* 399 F.3d 1148, 1152 (9th Cir.2005); *Salazar v. Ashcroft,* 359 F.3d 45, 50 (1st Cir.2004); *Diallo v. Ashcroft,* 381 F.3d 687, 695 (7th Cir.2004); *Elzour v. Ashcroft,* 378 F.3d 1143, 1150–51 (10th Cir.2004); *Rife v. Ashcroft,* 374 F.3d 606, 611–12 (8th Cir.2004); *Abdille v. Ashcroft,* 242 F.3d 477, 483 (3d Cir.2001); *Mussie v. INS,* 172 F.3d 329, 331 (4th Cir.1999).

Our sister circuits have diverged, however, as to what constitutes "firm resettlement" as a matter of law. According to the relevant regulation,

> [a]n alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, *an offer of permanent resident status, citizenship, or some other type of permanent resettlement* . . . .

8 C.F.R. § 208.15 (emphasis supplied). In some circuits, absent "an offer" of some kind of permanent resettlement, "firm resettlement" is not demonstrated. *See Diallo,* 381 F.3d at 694–95; *Abdille,* 242 F.3d at 486. Even in circuits hewing closely to the regulation, however, an "extended, undisturbed residence in a third country creates a presumption of firm resettlement that will satisfy the definition." *Maharaj v. Gonzales,* 416 F.3d 1088, 1092 (9th Cir.2005) (citing *Cheo v. INS,* 162 F.3d 1227, 1229 (9th Cir.1998)).

Other circuits have adopted a broader conception of "firm resettlement" by applying a "totality of the alien's circumstances" test. *See Mussie,* 172 F.3d at 331–32 (denying petition for review upon a finding of firm resettlement in part based on six-year stay in third country, receipt of government assistance, and renting of per-

sonal apartment); *Abdalla v. INS,* 43 F.3d 1397, 1400 (10th Cir.1994) (considering family ties); *Farbakhsh v. INS,* 20 F.3d 877, 881 (8th Cir.1994) (listing factors relevant to determination of firm resettlement, such as "family ties" and "business or property connections") (internal quotation marks omitted); *Chinese Am. Civil Council v. Att'y Gen.,* 566 F.2d 321, 326 (D.C.Cir.1977) (finding Chinese asylum applicants had firmly resettled during lengthy stay in Hong Kong); *but see Diallo,* 381 F.3d at 695 (rejecting "the now outdated 'totality of the circumstances' analysis").

■ We are convinced by the reasoning of those circuits that have applied the "totality of the circumstances" test for two reasons. First, as discussed below, the plain language of the regulation supports this understanding of firm resettlement. Second, the underlying purpose of asylum regulations—to provide refuge to desperate refugees who reach our shores with nowhere else to turn—accords with reserving the grant of asylum for those applicants without alternative places of refuge abroad, regardless of whether a formal "offer" of permanent settlement has been received.

■ The regulation states that one is "firmly resettled" if "prior to arrival in the United States" he has "received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement ...." 8 C.F.R. § 208.15. By its terms, the regulation places particular importance on the presence *vel non* of an actual offer of permanent resident status issued by an intermediate third country prior to arrival in the United States. While "permanent resident status" has an

analog in American law, *see, e.g.,* 8 C.F.R. § 101.1, as of course does "citizenship," the regulation presumably refers to "some other type of permanent resettlement" so that foreign statutes not precisely analogous to United States immigration provisions could be recognized by IJs evaluating whether an applicant has firmly resettled. Because not every nation employs an immigration regime as elaborate as that of the United States, "offers" of "some other type of permanent resettlement" may not always include written documentation, much less formal state-issued identification cards. The language of the regulation therefore also requires an IJ to examine the specific circumstances of an applicant's case to decide whether he has firmly resettled in a third country.[5]

Additionally, the purpose guiding this country's asylum regulations supports the result compelled by the regulatory language. The United States offers asylum to refugees not to provide them with a broader choice of safe homelands, but rather, to protect those arrivals with nowhere else to turn. This purpose is borne out, among other places, in 8 U.S.C. § 1158(a)(2)(A), which exempts from the general rule allowing any alien physically present in the United States to apply for asylum those aliens who could be removed to a "[s]afe third country."

## II. *Application to Sall's Stay in Senegal*

■ We conclude that the IJ's determination that Sall was "firmly resettled" in Senegal was not supported by substantial evidence. First, the IJ appears to have misstated the burden of proof, having stated that an "applicant has the burden of proving, by a preponderance of the evi-

---

**5.** Our sister circuits have discussed some relevant factors in their cases; in any event, we need not provide an exhaustive list—if such a thing could even exist—to settle the case before us.

dence," that he has not been firmly resettled. This is not accurate. It is true that once the *government* establishes a *prima facie* case of firm resettlement, an applicant bears the burden of showing that an exception applies and that a finding of firm resettlement is inappropriate in his case. *See* 8 C.F.R. § 208.15(a)-(b) (enumerating exceptions). The initial burden, however, lies on the government. *See Salazar,* 359 F.3d at 50 ("The case law treats this showing made by the government as creating a rebuttable presumption ...."). [6] This error alone would fatally weaken the IJ's finding of firm resettlement absent convincing evidence that the IJ's finding would have been identical absent the error-infected portions of her decision. *See Xiao Ji Chen v. DOJ,* 434 F.3d 144, 161 (2d Cir.2006) (concluding in substantial evidence review that "despite errors—considered in the context of the IJ's entire analysis—we can state with confidence that the IJ would adhere to his decision were the petition remanded").

Here, however, sufficient additional error tarnishes the IJ's decision as to require remand. For example, the IJ found Sall not to be credible in part because he introduced into evidence a letter from a Senegal Red Cross official in Saint–Louis, a Senegal city purportedly "not [in] a region in which the refugee camp is located." During his testimony, Sall stated that the official lived in Saint–Louis but visited the Thilogne refugee camp frequently because he was the regional Red Cross president. Asked what region Thilogne was in, Sall answered "the region of the Fleue." [7] Saint–Louis is the capital of the Saint–Louis region. While Sall's testimony certainly would allow a layman to believe that Thilogne is not in the region of Saint–Louis [8]—and therefore that it makes little sense for a resident of the city of Saint–Louis to have responsibility for a camp in Thilogne—it turns out that Senegal renamed its "Fleuve" region "Saint–Louis" in 1984. [9] Senegal's regions are now all

6. Because applicants will have an incentive to withhold evidence bolstering a finding of firm resettlement, we agree with our sister circuits that have held that a lengthy, peaceful stay in a third country creates a presumption of firm resettlement that an applicant has the burden to rebut. *See, e.g., Cheo,* 162 F.3d at 1229 (holding that a "three year undisturbed stay" created presumption); *Chinese Am. Civic Council,* 566 F.2d at 328 n. 18 ("Resettlement is largely a factual question which, once that fact appears of record, the applicants bear the burden of overcoming."). From the record in this case, Sall's stay in Senegal does not appear to have been sufficiently "undisturbed" and "peaceful" to create a presumption of firm resettlement, notwithstanding the five-year length of his stay.

7. We take judicial notice that "fleuve," French for "river," is a common term for the area surrounding the river that serves as the border between Senegal and Mauritania. *See, e.g.,* "Saint–Louis et sa Région," *at* http://www.senegalaisement.com/senegal/region_du_fleuve.html (discussing Saint–Louis's longstanding nickname, "Région du Fleuve"

(region of the river)). Senegal is a French-speaking country. It appears that Sall, who cannot read or write in French or English, meant "Fleuve" when he answered "Fleue."

8. Indeed, Sall stated that the camp was "not in the region of San Louis." It appears to us, however, that Sall may have been confused by the questions and that his interlocutors lacked a solid understanding of Senegal's geography. For example, the IJ asked the government's counsel, "I don't have a map here that shows the regions of Senegal, do you?" The government did not, and the government's counsel said, "San Louis on this map appears to be a city, not a province."

9. *Compare* 1989 Political Map of Senegal, University of Texas Perry–Castañeda Map Collection, *available at* http://www.lib.utexas.edu/maps/africa/senegal_pol_1989.pdf (showing "Saint–Louis" region including Thilogne), *with* Rand McNally, *The New International Atlas* 150 (1980) (showing "Fleuve" region including cities of Thilogne and Saint–Louis).

named for their capital cities.[10]

■ We note also that the United States Court of Appeals for the Seventh Circuit reversed a finding of "firm resettlement" in a similar case. *See Diallo*, 381 F.3d at 695–96 (concluding that, even under "totality of the circumstances" test, Mauritanian petitioner was not firmly resettled in Senegal after spending four years there performing "itinerant work"). We agree with the Court in that case that the mere passage of four years, standing alone, does not constitute firm resettlement. *Id.* at 696. On remand, the IJ should consider the totality of the circumstances,[11] including whether Sall intended to settle in Senegal when he arrived there, whether he has family ties there, whether he has business or property connections that connote permanence, and whether he enjoyed the legal rights—such as the right to work and to enter and leave the country at will—that permanently settled persons can expect to have.[12] Of particular importance to this inquiry is whether he received an actual offer of permanent resident status.

### III. *Sall's Asylum Claim*

■ The Attorney General may grant asylum to persons meeting the definition of "refugee." *See* 8 U.S.C. § 1158(b) (granting discretion to Attorney General); *Id.* § 1101(a)(42) (defining "refugee"). If Sall's testimony is truthful, he has demonstrated past persecution on account of his race, which is a protected class. *Id.* § 1101(a)(42). He testified that he was forced at gunpoint from his house and homeland by soldiers who were motivated by race and murdered his brothers. At issue here is whether "substantial evidence" supports the IJ's finding that Sall's testimony and documentary evidence did not adequately support his claim. *See, e.g., Yun–Zui Guan*, 432 F.3d at 394.

Because the IJ's errors in relation to the question of firm resettlement relate so closely to the merits of Sall's asylum claim, we cannot confidently state that the IJ will deny asylum if we remand. *See Xiao Ji Chen*, 434 F.3d 144, 161. If one believes, as it seems the IJ did, that Sall presented forged Red Cross documentation of a stay in a refugee camp, his overall story of persecution becomes deeply implausible.

---

10. In a further rearrangement, Senegal created a new region called Matam in 2002. This region, spun off from Saint–Louis, includes Thilogne. *See* United Nations Cartographic Section, Senegal (January 2004), *available at* http://www.un.org/Depts/Cartographic/map/profile/senegal.pdf (showing Matam separate from Saint–Louis); *see also* "Saint–Louis et sa Région," *ante* note 7 (predicting that "pour les amoureux de cette magnifique contrée, ces deux régions administratives ne feront toujours qu'une dans les bouches sous le nom de 'Région du Fleuve'," which, loosely translated, means "in the mouths of the lovers of this splendid area, these two administrative regions will always be nothing but 'the Region of the River' "). Thilogne remained in Saint–Louis at the time of Sall's 1997 hearing and of the underlying events.

11. When evaluating whether an applicant has been "firmly resettled," the IJ may consider the same evidence usually available when making other determinations relevant to the merits of an asylum claim, such as whether an applicant truly suffered past persecution. As in other determinations, relevant factors will include the content and believability of the applicant's testimony and the substance and persuasiveness of any supporting materials he submits.

12. We note that if Sall's testimony is considered credible, it suggests that he did not enjoy such rights. For example, Sall testified that in Dakar he was "working illegally because we used to hide from the police" and said that he "knew that if we get arrested, they will ask us where we come from."

*See In Re O–D–*, 21 I. & N. Dec. 1079, 1083 (BIA 1998) (holding that asylum applicant's submission of false documents supported adverse credibility finding); *cf.* 8 U.S.C. § 1324c(a)(2) (declaring it unlawful "to use, ... or to provide any forged, counterfeit, altered, or falsely made document in order to ... obtain a benefit under" the INA). We cannot know what the IJ would have found had she believed Sall's Red Cross letter to be legitimate— or at least potentially legitimate—instead of obviously bogus because it issued from the purportedly wrong region. We therefore remand so that IJ may consider whether Sall qualifies for asylum now that the Red Cross letter no longer appears objectionable on its face.[13]

### Conclusion

For the foregoing reasons, the petition for review is granted, the order of the BIA is vacated and the cause is remanded to the BIA for further proceedings consistent with this opinion.

13. We also find that to the extent the IJ made a finding based on "changed circumstances," this finding should also be reexamined on remand. The IJ designated Senegal as Sall's country of deportation, and after denying asylum granted "withholding of deportation" to Mauritania (*i.e.*, stated that should Sall be deported rather than voluntarily depart, he would not be deported to Mauritania) because the situation there was "not fully resolved for all the refugees."