Jigme WANGCHUCK, Petitioner,

v.

DEPARTMENT OF HOMELAND SE-
CURITY, Immigration & Customs
Enforcement, Respondents.

No. 04–1307 AG.

United States Court of Appeals,
Second Circuit.

Submitted: Feb. 17, 2006.

Decided: May 15, 2006.

Gary J. Yerman, New York NY, for Petitioner.

Anton P. Giedt, Assistant United States Attorney, District of Massachusetts (Michael J. Sullivan, United States Attorney, of counsel) Boston, MA, for Respondents.

Before: KEARSE and SACK, Circuit Judges, and STANCEU, Judge.*

SACK, Circuit Judge.

The petitioner, Jigme Wangchuck, petitions for the review of a decision of the Board of Immigration Appeals ("BIA") denying his application for asylum, withhold-

* The Honorable Timothy C. Stanceu, of the United States Court of International Trade, sitting by designation.

ing of removal to India and China, and relief under the Convention Against Torture[1] ("CAT"). Wangchuck, who was born in India to Tibetan refugee parents and has never been to China (of which Tibet is now an "autonomous region"[2]), asserts that the BIA erred in concluding that he has failed to demonstrate a well-founded fear of persecution in India or China. Wangchuck also challenges the BIA's conclusion that because he was firmly resettled in India, he is ineligible for asylum from China. We grant the petition because the BIA: (1) failed to determine Wangchuck's nationality; (2) improperly placed on him the burden of proving that he was not firmly resettled in India; (3) applied erroneous legal standards in its determination of whether Wangchuck had a well-founded fear of persecution in China; and (4) ordered Wangchuck removed, in the alternative, to China, despite the fact that Wangchuck, who was not born in China, may not be a national of China or have any other ties to the country that would authorize the agency to deport him to China.

## BACKGROUND

Except where otherwise indicated, the facts underlying this petition are undisputed.

Wangchuck, a Buddhist monk, was born in 1972 in the state of Himachal Pradèsh, in northern India. His parents are natives of Tibet who fled to India in 1959 after China suppressed an uprising against its assertion of sovereignty over Tibet. The Indian government considered Wangchuck and his parents to be refugees. As a refugee, Wangchuck received a "Registration Certificate" from that government, which served as a residential permit and identity document. The terms of the Registration Certificate, which was renewed annually throughout the years that Wangchuck resided in India, required him to inform local officials when he traveled to other parts of India for extended periods of time. The Indian government also issued Wangchuck an "Identity Certificate," which allows the holder to travel outside of India and to lawfully return provided that he or she obtains a "No Objection to Return to India" ("NORI") stamp.

On September 28, 1997, Wangchuck left India for the United States. He was admitted into the country on a six-month visitor's visa. Wangchuck states that before leaving India, he received a NORI stamp on his Identity Certificate indicating that the Indian government would not object to his returning to India. He was nonetheless denied a return visa when he attempted to obtain one in 1998 from the Indian Consulate in New York. Affidavits and correspondence from American citizens who accompanied Wangchuck to the Indian Consulate aver that consulate personnel told Wangchuck that his Identity Certificate and NORI stamp had expired and that they could only be renewed in India.

On September 21, 1998, Wangchuck applied for asylum and withholding of removal, specifically removal to India. Nearly a year later, on September 14, 1999, an immigration judge ("IJ") denied his application and granted him voluntary departure. The denial was affirmed by the BIA. On February 11, 2002, however, while

---

1. United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85. *See also* 8 C.F.R. § 208.16(c) (implementing regulations).

2. *See* U.S. Dep't of State, Bureau of East Asian Affairs, *Background Note: China,* http://www.state.gov/r/pa⅞/ei/bgn/18902.htm (last visited Apr. 10, 2006).

Wangchuck's petition for review of the BIA's decision was pending in this Court, the then-Immigration and Naturalization Service [3] stipulated to the vacatur of the BIA's and the IJ's decisions because the tape recording of the IJ's September 14, 1999, decision could not be located. Beginning on November 19, 2002, another IJ held hearings on Wangchuck's application.

At an August 27, 2003, hearing, Wangchuck testified that while in India, he attended protests every March 10 to commemorate the failed 1959 Tibetan uprising against Chinese rule on that date. In March 1992, when he was living in southern India, Wangchuck attended a protest in the city of Hupli. The demonstration was unusually large, he explained, because a Chinese dignitary was visiting the city at the time. Wangchuck testified that the Indian police arrested him. They detained him for four nights, until the groups organizing the protest paid a bribe to have him released. Wangchuck also testified that he was beaten at the 1992 protest. On cross-examination, Wangchuck said that he was "emotionally charged while protesting" and that the beating could have been to "calm us down." Tr. of Asylum Hr'g, A76 088 399, Aug. 27, 2003, at 47. According to Wangchuck's testimony before the IJ, the police in southern India "continued to intimidate" him after his release from jail, requiring him to report to the police station every month, and trying to "extract money out of" him. *Id.* at 22–23. He further testified that as a result of this harassment, he "couldn't stay [in southern India] any longer." *Id.* at 23.

Wangchuck moved to Dharamsala, in northern India. He testified that the following year, during the March 10 protests of 1993, he was again arrested. This time,

Wangchuck says, he was held in jail only for one night; he does not allege that he was beaten.

Wangchuck testified that he was arrested a third time during the March 10 protests of 1996, this time in Delhi. According to Wangchuck, he spent three nights in a Delhi jail.

Wangchuck has never been to Tibet. He testified, however, that he fears he will be arrested by Chinese authorities if he enters the region. He named a Tibetan acquaintance who, according to Wangchuck, was born in India and traveled to Tibet to visit relatives, only to be arrested and held in prison for several years. He also produced a 2002 United States Department of State Country Report for China, which states that Chinese "authorities continued to commit serious human rights abuses, including instances of torture, arbitrary arrest, detention without public trial, and lengthy detention of Tibetan nationalists for peacefully expressing their political or religious views." U.S. Dep't of State, Country Reports on Human Rights Practices, 2002, China (includes Tibet, Hong Kong, and Macau) (March 31, 2003), *available at* http://www.state.gov/% g/drl/rls/hrrpt/2002/%18239.htm (last visited Apr. 10, 2006). The report also states: "The [Chinese] Government remained suspicious of Tibetan Buddhism in general because of its links to the Dalai Lama, and this suspicion extended to religious adherents who did not explicitly demonstrate their loyalty to the State." *Id.*

On August 27, 2003, the IJ denied Wangchuck asylum and withholding of removal. The IJ concluded that Wangchuck had firmly resettled in India and was therefore ineligible for asylum from China.

---

**3.** "The then-Immigration and Naturalization Service ... has since ceased to exist as an independent agency, *see* Homeland Security Act of 2002, Pub.L. No. 107–296, 116 Stat. 2135 (Nov. 25, 2002) ...." *United States v. Ceballos,* 340 F.3d 115, 118 (2d Cir.2003).

528

The IJ also determined that Wangchuck had failed to demonstrate a well-founded fear of future persecution in either India or China, or a likelihood that he would be tortured in either country. The IJ ordered Wangchuck removed to India or, if "India does not accept [him], . . . to China." Oral Decision of the IJ, Aug. 27, 2003, at 18. The BIA affirmed the IJ's decision in a two-and-a-half page per curiam decision dated February 12, 2004. Wangchuck petitions for review of that decision.

## DISCUSSION

### I. Standard of Review

█ When the BIA briefly affirms the decision of an IJ and "adopt[s] the IJ's reasoning in doing so," we review the IJ's and the BIA's decisions together. *Secaida–Rosales v. INS*, 331 F.3d 297, 305 (2d Cir.2003); *see also Yun–Zui Guan v. Gonzales*, 432 F.3d 391, 394–95 (2d Cir.2005) (per curiam). But when the BIA does not "adopt the decision of the IJ to any extent . . . . we review the decision of the BIA." *Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir.2005). Here, the BIA did not expressly "adopt" the IJ's decision, but its brief opinion closely tracks the IJ's reasoning. It is not entirely clear whether we include the IJ's decision in our review in such a situation. *Compare Yan Chen*, 417 F.3d at 271 (" '[O]nly if the BIA expressly adopts or defers to a finding of the IJ, will we review the decision of the IJ.' ") (quoting *Kayembe v. Ashcroft*, 334 F.3d 231, 234 (3d Cir.2003)) *with Secaida–Rosales*, 331 F.3d at 305 (finding it appropriate to review the IJ's decision when BIA opinion "primarily recount[s] the IJ's reasoning"). Although we do not need to resolve the issue—because our conclusion would be the same either way—for the sake of completeness we will consider both the IJ's and the BIA's opinions.

█ We review the BIA's factual findings for substantial evidence, *see id.* at 306–07, its interpretation of immigration statutes with *Chevron* deference, *see INS v. Aguirre–Aguirre*, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)), and its interpretations of immigration regulations with "substantial deference," *Joaquin–Porras v. Gonzales*, 435 F.3d 172, 178 (2d Cir.2006) (internal quotation marks and citations omitted). However, "when the situation presented is the BIA's application of legal principles to undisputed facts, rather than its underlying determination of those facts or its interpretation of its governing statutes, our review is de novo." *Monter v. Gonzales*, 430 F.3d 546, 553 (2d Cir.2005) (internal quotation marks and citation omitted; alteration incorporated).

### II. The BIA's Decision

#### A. Wangchuck's Nationality

█ As we explained in *Dhoumo v. BIA*, 416 F.3d 172 (2d Cir.2005) (per curiam), a "petitioner's nationality, or lack of nationality, is a threshold question in determining his eligibility for asylum." *Id.* at 174. Under section 208(b) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(b)(1)(A), an alien may be granted asylum if the Attorney General determines that he or she is a "refugee." *See Zhang Jian Xie v. INS*, 434 F.3d 136, 139 (2d Cir.2006). A "refugee" is

any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country

because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42). The INA thus provides that individuals are eligible for asylum only if they fear persecution in the country of their nationality or, if they have no nationality, in the country in which they most recently "habitually resided."

Under the INA, then, if Wangchuck is an Indian national, he is eligible for asylum only if he has a well-founded fear of persecution in India. Were he a Chinese national, he would be required to demonstrate a well-founded fear of persecution in China. And if he has no nationality, he would only be eligible for asylum from India, because that is the most recent—indeed, it is the only—country in which he "habitually resided" prior to entering the United States.

■ Yet, despite the centrality of Wangchuck's nationality to the asylum analysis, neither the IJ nor the BIA sought to determine it. Instead, they seemed to assume that Wangchuck could be eligible for asylum based on a well-founded fear of persecution in either India *or* China. In *Dhoumo*, which also involved a Tibetan petitioner born in India, we concluded that the BIA had erred in failing to determine the petitioner's nationality. *Dhoumo*, 416 F.3d at 174. Here, too, the IJ and the BIA erred by failing to make this threshold determination. And as we will discuss below, the BIA also erred in determining that Wangchuck was firmly resettled in India and did not have a well-founded fear of persecution in China. *See infra*, Parts II.B & C. Because the BIA did not properly conclude that Wangchuck would be ineligible for asylum if he were a Chinese national, its failure to determine

his nationality is not harmless. *See infra*, Part III.

### B. Firm Resettlement

■ The IJ and the BIA also made what seems to us to be a threshold legal error in the course of determining that Wangchuck was firmly resettled in India. Under the INA, asylum may not be granted to an alien on account of persecution in one country if he or she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi); *see also* 8 C.F.R. § 208.15 (describing the standards for determining whether an alien was firmly resettled). In *Sall v. Gonzales*, 437 F.3d 229 (2d Cir.2006) (per curiam), we concluded that the government bears the burden of proving that an asylum applicant was firmly resettled:

> [T]he IJ appears to have misstated the burden of proof, having stated that an "applicant has the burden of proving, by a preponderance of the evidence," that he has not been firmly resettled. This is not accurate. It is true that once the *government* establishes a *prima facie* case of firm resettlement, an applicant bears the burden of showing that an exception applies and that a finding of firm resettlement is inappropriate in his case. The initial burden, however, lies on the government.

*Id.* at 233–34 (citation omitted; emphasis in original). It appears that in this case, too, the IJ erroneously placed the burden of proof on the petitioner. *See* Oral Decision at 11–12 ("The first determination in this matter is whether the respondent has established that he has not been firmly resettled in India."). And the BIA affirmed without correcting the error. *See In re Jigme Wangchuck*, A76 088 399, (BIA Feb. 12, 2004), at 2.

## C. Fear of Persecution in China

As an alternative ground for denying Wangchuck's asylum application, the BIA and the IJ concluded that Wangchuck had not established a well-founded fear of persecution in China. In arriving at this conclusion, the IJ stated:

> The record reflects that the Tibetans who are openly active against the Chinese government in Tibet may be subject to imprisonment and persecution. However, it is not quite clear exactly how the Chinese government would treat the respondent. It does not appear that the respondent would be well known or had any leadership role in any anti-Chinese organizations. The Court frankly finds that there is simply not enough evidence to show that he *would be persecuted* if he had to go back to China.

Oral Decision at 16–17 (emphasis added). Affirming the IJ's decision, the BIA wrote:

> The showing of poor treatment of Tibetans in China is not sufficient to prove that the respondent *more likely than not* faces persecution or torture in that country. . . . The record does not reflect that returnees are *necessarily* detained. The respondent is a monk and a follower of the Dalai Lama, but the mere adherence to this religion *does not necessarily result in imprisonment or torture.*

*In re Wangchuck*, at 2 (emphasis added).

■ In concluding that Wangchuck had not established a well-founded fear of persecution in China because he had not shown that he "would be persecuted," that it was "more likely than not" that he would be persecuted, or that his removal to China would "necessarily result" in persecution, the IJ and the BIA employed erroneous legal standards. The "more likely than not" standard applies to withholding of removal rather than to asylum. *See Hong Ying Gao v. Gonzales,* 440 F.3d 62,

66 (2d Cir.2006) ("An alien's fear may be well-founded even if there is only a slight, though discernible, chance of persecution. If an applicant satisfies *the higher burden* of demonstrating that such persecution is more likely than not, she is automatically entitled to withholding of removal under 8 U.S.C. § 1231(b)(3)." (internal quotation marks and citations omitted; emphasis added)). Requiring an asylum applicant to prove that he "would be persecuted" or that his removal would "necessarily result" in persecution appears to impose an even higher, and therefore more inaccurate, burden. "A fear of persecution is considered to be well founded . . . if it is genuine and if a reasonable person in the applicant's circumstances would fear persecution." *In re A–E–M,* 21 I. & N. Dec. 1157, 1159, Interim Decision (BIA 1998); *see also Ramsameachire v. Ashcroft,* 357 F.3d 169, 178 (2d Cir.2004) (to establish well-founded fear of persecution, alien must prove "that he subjectively fears persecution and establish that his fear is objectively reasonable"). The IJ and the BIA erred in requiring Wangchuck to prove more.

## D. Removal to China

As noted, the IJ and the BIA concluded that Wangchuck should be removed to India or, if "India does not accept [him], . . . to China." Oral Decision at 18. "When an alien is found ineligible to remain in the United States, the process for selecting the country to which he will be removed is prescribed by 8 U.S.C. § 1231(b)(2)." *Jama v. Immigration and Customs Enforcement,* 543 U.S. 335, 337, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005). As summarized by the Supreme Court:

> The statute . . . provides four consecutive removal commands: (1) An alien shall be removed to the country of his choice (subparagraphs (A) to (C)), unless

one of the conditions eliminating that command is satisfied; (2) otherwise he shall be removed to the country of which he is a citizen [or subject or national] (subparagraph (D)), unless one of the conditions eliminating that command is satisfied; (3) otherwise he shall be removed to one of the countries with which he has a lesser connection (clauses (i) to (vi) of subparagraph (E)); or (4) if that is "impracticable, inadvisable or impossible," he shall be removed to "another country whose government will accept the alien into that country" (clause (vii) of subparagraph (E)).

*Id.* at 341, 125 S.Ct. 694.

■■■ The BIA did not explain its basis for concluding that Wangchuck may be deported to China pursuant to 8 U.S.C. § 1231(b)(2), and it is not clear, on this record, that he may be. Wangchuck has not chosen to be removed to China, so he may not be removed there under subparagraphs (A), (B), or (C). As discussed, we do not know if he is a Chinese "subject, national, or citizen," so we cannot tell whether he may be removed to China under subparagraph (D). 8 U.S.C. § 1231(b)(2)(D). And China does not seem to fall within any of the additional categories of countries authorized by subparagraph (E), which reads:

(E) Additional Removal Countries.

If an alien is not removed to a country under the previous subparagraphs of this paragraph, the Attorney General shall remove the alien to any of the following countries:

(i) The country from which the alien was admitted to the United States.

(ii) The country in which is located the foreign port from which the alien left for the United States or for a foreign territory contiguous to the United States.

(iii) A country in which the alien resided before the alien entered the country from which the alien entered the United States.

(iv) The country in which the alien was born.

(v) The country that had sovereignty over the alien's birthplace when the alien was born.

(vi) The country in which the alien's birthplace is located when the alien is ordered removed.

(vii) If impracticable, inadvisable, or impossible to remove the alien to each country described in a previous clause of this subparagraph, another country whose government will accept the alien into that country.

8 U.S.C. § 1231(b)(2)(E). Because Wangchuck was not born in China and indeed, so far as the record discloses, has never been to China or any country over which China has had sovereignty, he cannot be removed there under clauses (i) through (vi). And inasmuch as the BIA has cited no evidence that China will accept him, we do not know whether he can be removed to China under clause (vii). We think that the BIA erred in ordering that Wangchuck be removed, in the alternative, to China without first determining that he was eligible to be removed there under 8 U.S.C. § 1231(b)(2).

### III. Effect of the BIA's errors

The IJ and the BIA thus made several significant legal errors in the course of denying Wangchuck's application for asylum and withholding of removal to India and China. Ordinarily, such errors require us to grant the petition, vacate the BIA's decision, and remand for further proceedings. *See Cao He Lin v. U.S. Dep't of Justice,* 428 F.3d 391, 401 (2d Cir.2005) (stating that "serious legal errors ... will ordinarily require vacatur and re-

mand for a new assessment of the evidence and/or a new hearing"); *see also Sall,* 437 F.3d at 234 (stating that the BIA's error in placing the burden of proof regarding firm resettlement on the petitioner "alone would fatally weaken the IJ's finding of firm resettlement absent convincing evidence that the IJ's finding would have been identical absent the error-infected portions of her decision" (citing *Xiao Ji Chen v. U.S. Dep't of Justice,* 434 F.3d 144, 161 (2d Cir.2006)). On the other hand, remand is not required when the BIA "explicitly adopts an alternative and sufficient basis for [its] determination." *Cao He Lin,* 428 F.3d at 401.

■ We think that a remand is necessary here. It is true that the BIA concluded that Wangchuck did not have a well-founded fear of persecution in either India *or* China. Because Wangchuck would need to prove such a fear in at least one of those countries to be eligible for asylum, regardless of his nationality or whether he was firmly resettled, the BIA's failure to determine Wangchuck's nationality and its misallocation of the burden of proof as to firm resettlement would be harmless if its determinations as to Wangchuck's fears of persecution in India and China both independently withstood review. *Cf. Dhoumo,* 416 F.3d at 175 (remanding when failure to determine nationality "was not harmless"); *Sall,* 437 F.3d at 235 (remanding because of errors in determining firm resettlement after concluding that "we cannot confidently state that the IJ will deny asylum if we remand").

But, as we have discussed, the IJ and the BIA applied erroneous legal standards in determining whether Wangchuck had a well-founded fear of persecution in China. Because "[w]e may not enforce [an agency's] order by applying a legal standard the [agency] did not adopt," *NLRB v. Ky.*

*River Cmty. Care, Inc.* 532 U.S. 706, 721, 121 S.Ct. 1861, 149 L.Ed.2d 939 (2001), we may not ourselves determine whether Wangchuck had such a fear; *see also Cao He Lin,* 428 F.3d at 400 ("To assume a hypothetical basis for the IJ's determination, even one based in the record, would usurp her role."); *SEC v. Chenery,* 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency."). The BIA's conclusion that Wangchuck did not have a well-founded fear of persecution in China therefore cannot stand. And because this conclusion cannot stand, the BIA's failure to determine Wangchuck's nationality and to analyze properly whether he was firmly resettled are not harmless. If Wangchuck is a Chinese national, was not firmly resettled in India, and has a well-founded fear of persecution in China, he is eligible for asylum. Because the BIA did not correctly address any of these issues, we are compelled to vacate its decision and remand.

Even if the BIA determines that Wangchuck is not eligible for asylum, moreover, it must revisit its order that he be removed, in the alternative, to China. Wangchuck may be removed to China only if China is among the "[c]ountries to which [he] may be removed" under 8 U.S.C. § 1231(b). On remand, the BIA should apply the statutory factors and reconsider whether Wangchuck may be removed to that country.

In emphasizing certain errors made by the IJ and the BIA in this case, we do not express or mean to imply any opinion as to whether the BIA's other determinations are correct. In particular, we do not express nor mean to imply any opinion regarding the BIA's determination that

Wangchuck does not have a well-founded fear of persecution in India. Our review of Wangchuck's petition is limited to the issues we have discussed, which provide a sufficient basis for us to grant the petition and remand the case to the BIA.

## CONCLUSION

For the foregoing reasons, we grant Wangchuck's petition for review, vacate the BIA's decision, and remand the case to the BIA for further proceedings consistent with this opinion.