**Sidi MAKADJI, Petitioner,**

v.

**Alberto GONZALES, United States Attorney General,\* Respondent.**

**Docket No. 03–40341.**

United States Court of Appeals, Second Circuit.

Argued: Feb. 23, 2006.

Decided: Dec. 5, 2006.

As Amended Jan. 22, 2007.

---

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto Gonzales is substituted for his predecessor, Attorney General John Ashcroft, as the respondent in this case.

Lynn Neugebauer, Safe Horizon Immigration Law Project, Jackson Heights, NY, for Petitioner.

Loretta F. Radford, Assistant United States Attorney (David E. O'Meilia, United States Attorney for the Northern District of Oklahoma, on the brief), United States Attorney's Office for the Northern District of Oklahoma, Tulsa, OK, for Respondent.

Before LEVAL, KATZMANN, and RAGGI, Circuit Judges.

LEVAL, Circuit Judge.

Sidi Makadji petitions for review of the decision of the Board of Immigration Appeals ("BIA" or the "agency"), which affirmed the decision of the Immigration Judge ("IJ") denying his claims for political asylum and withholding of removal under the Immigration and Nationality Act.

The IJ denied asylum on the ground that, after Makadji was forcibly deported from Mauritania on account of race, he "firmly resettled" in Mali. We hold that the IJ erred by misplacing the burden of proof on Makadji, and by finding Makadji firmly resettled in Mali without substantial evidence to support the finding. The IJ's denial of Makadji's withholding of removal claim was also in error, because the IJ failed to shift the burden of proof to the government upon Makadji's showing of past persecution. We therefore vacate the agency's decision and remand for rehearing.

## Background

### I. *Facts*

Makadji is a native of Kankossa in Mauritania. He was born in 1970, went to school for two years and worked as a farmer. In 1989, Makadji was forced to leave Mauritania because he is black. He testified, "[T]hey claim that black people are not Mauritanians. Therefore, they order all the blacks that they are Mauritanian, they must leave.... Mauritanian officers came and order us to leave because Mauritania is not our country and if you refuse, they will force us out." Hearing Tr., at 14. The officers beat Makadji and broke his father's hand. They forced Makadji and his family into trucks filled with black Mauritanians and drove them to the border of neighboring Mali. At gunpoint, the officers warned "never to come back. If we come back, they will kill us." *Id.* at 16. Makadji's forcible deportation was apparently part of a campaign to expel southerners and give their land to White Moors, during which, according to the United States State Department Country Reports on Human Rights Practices, roughly 70,-000 "members of largely southern-based ethnic groups" were expelled from 1989 to 1991. *See Country Reports on Human Rights Practices—2000, Mauritania,* U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, at 7 (Feb. 2001) ("Country Report").

Makadji, his parents, and his brother crossed the Malian border on foot and continued to the town of Bamako. According to Makadji, hearing that the Mali government intended to send back Mauritanian refugees, he and his family did not register with the government. They did not have permission to live in Mali. Makadji and his family remained on the streets until a man in Bamako took them in.

Makadji remained in Mali for ten years. Makadji, his parents and brother lived together in a room offered to them as an act of charity (apparently by the same man who originally took them in). Makadji explained that there was no certainty that the room would be permanently available. Asked whether he worked in Mali, Makadji testified, "[I]t was just odd jobs daily. Sometime I don't have anything. Just to help myself and my parents to survive. There was no work." Hearing Tr., at 17.

During his time in Mali, Makadji did not obtain any official permission or recognition from the Malian government. His father obtained for him a Mauritanian I.D. card by bringing Makadji's birth certificate to the Mauritanian embassy. According to Makadji, his father obtained the I.D. card "[b]ecause in Mali we did not have Mali documents so we need this [identification card]. Before I go anywhere I could be recognized as Mauritanian." *Id.* at 18. In 1999, Makadji left Mali using another person's passport and traveled, via Ghana, to the United States. As to why he left Mali, he explained, "It was not easy 10 years for us because Mali government did not have us, in fact, Mali government was blaming the Mauritanians there for all the problems they have, disease or if they lack

of—whatever they're lacking they said is because of us so I have to leave there because things were getting bad for us." *Id.* at 18–19. Makadji's parents and brother stayed in Mali and remained there as of the hearing in this case. Makadji testified that his family did not come to the United States because "[t]hey don't have the means to come here. It's not easy to come." *Id.* at 25–26. While in the United States, Makadji has sent part of his earnings from working in a bakery home to his family.

As for returning to Mali or Mauritania, Makadji testified, "I cannot go back to Mali because I suffered in Mali, so I don't want to go back." *Id.* at 21. And, "[i]f I were to go back to Mauritania today, what I have suffered before, it will be even worse for me. I'm sure of that." *Id.* Makadji explained that his family remains in Mali because, "[a]lthough they are [in a] difficult situation there, it's always better for them to remain there as long as I am here, I will help and I'm working I will at least do my best to help them. It's better for them to stay there than going back home [to Mauritania]." *Id.* at 25–26. His family has not tried to return to Mauritania, because "[w]e never forgot the warning they give us if we go back, we return there, we'll be killed, so we just remember that." *Id.* at 20–21.

## II. *Procedure*

In April 2000, Makadji filed an application for asylum, withholding of removal, and relief under CAT. At the hearing before the IJ, Makadji's primary evidence was (1) his testimony, summarized above; (2) a letter from his father dated November 1999, saying, "The Malian Government will not grant rights for us. They want us to repatriate to Mauritania"; and (3) the Country Report on Human Rights Practices for Mauritania—2000, issued by the United States State Department. The Country Report documents the "the redistribution of land [in Mauritania] from southerners and Haratines to White Moors" and that "some southerners . . . had been expelled or fled from the country from 1989 to 1991." Country Report, at 4–5. It adds that "[t]he Government continued to welcome the return of any citizens who had been expelled or who had fled from 1989 to 1991," *id.* at 3, and that some of those returning to Mauritania after the 1989 crisis were granted land rights, while others were not, *id.* at 4–5. It asserts, "The Government has stated since 1993 that any citizen outside the country may return," and 33,248 returnees had been documented out of the roughly 70,000 who were expelled during the 1989–91 crisis. *Id.* at 7.

Although finding Makadji's testimony credible, the IJ denied Makadji's petition, concluding that the Malian government implicitly offered permanent resettlement to Makadji and his family, which made Makadji ineligible for asylum. In support of this finding, the IJ emphasized that Makadji resided in Mali for ten years; his family remained in Mali; Makadji offered no evidence to establish that the Malian government engaged in wholesale repatriation of Mauritanians or intended to deport him or his family to Mauritania, or that his parents "are living a surreptitious[ ] existence in Mali"; Makadji worked odd jobs in Mali; and Makadji's father obtained for him a Mauritanian I.D. card, the purpose of which was "to proclaim that he was a Mauritanian citizen while living in Mali."

The IJ also denied Makadji's claim for withholding of removal, because Makadji "has not established that it is clearly probable that he will be harmed if he returns to Mauritania." The IJ characterized Makadji's beating and deportation from Mauritania as "past persecution," but found

essentially that Makadji failed to establish that circumstances had not changed in Mauritania since 1989. The IJ relied heavily on the Country Report in finding that Mauritania had admitted many returnees who were persecuted in 1989.[1] Upon these findings, the IJ ordered Makadji's removal. On Makadji's appeal, the BIA affirmed the decision of the IJ without discussion.

## Discussion

### I. *Asylum—Firm Resettlement*

As noted above, the IJ denied Makadji's application for asylum premised on likelihood of persecution in Mauritania, concluding that Makadji was ineligible for asylum because he had been offered permanent resettlement in Mali and was firmly resettled there. In our view this ruling was flawed and requires that we remand the case for two related reasons.[2] First, the IJ erroneously placed the burden of proof regarding the question of resettlement on Makadji. Second, the IJ's conclusion was not supported by substantial evidence in the record considered as a whole. *Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir.2003) ("[A] finding will stand if it is supported by reasonable, substantial and probative evidence in the record when considered as a whole." (quotation marks omitted)).

An alien seeking asylum in the United States by reason of persecution in his homeland is ineligible for this relief if he "firmly resettled" in another country prior to arriving in the United States. *See* 8 U.S.C. § 1158(b)(2)(A)(vi); 8 C.F.R. § 208.13(c). Courts have explained that asylum is available "to protect those arrivals with nowhere else to turn," whereas an alien who firmly resettled in another country after leaving the place of persecution has found a safe homeland. *Sall v. Gonzales*, 437 F.3d 229, 233 (2d Cir.2006); *see Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 55, 91 S.Ct. 1312, 28 L.Ed.2d 592 (1971). The regulation covering determination of firm resettlement provides:

An alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement unless he or she establishes:

(a) That his or her entry into that country was a necessary consequence of his or her flight from persecution, that he or she remained in that country only as long as was necessary to arrange onward travel, and that he or she did not establish significant ties in that country; or

(b) That the conditions of his or her residence in that country were so substantially and consciously restricted by the authority of the country of refuge that he or she was not in fact resettled. In making his or her determination, the asylum officer or immigration judge shall consider the conditions under which other residents of the country live; the type of housing, whether permanent or temporary, made available to

---

1. The IJ also found that Makadji failed to establish that he would be tortured upon return to Mauritania and denied his CAT claim. Makadji did not appeal the denial of his CAT claim to the BIA or this Court. We therefore do not consider this claim. *See* 8 U.S.C. § 1252(d); *Yueqing Zhang v. Gonzales*, 426 F.3d 540, 541 n. 1 (2d Cir.2005).

2. When the BIA affirms the IJ's decision without discussion, we review the IJ's decision as the final agency determination. *See* 8 C.F.R. § 1003.1(e)(4); *Twum v. INS*, 411 F.3d 54, 58 (2d Cir.2005).

the refugee; ... and the extent to which the refugee received permission to hold property and to enjoy other rights and privileges, such as travel documentation that includes a right of entry or reentry, education, public relief, or naturalization, ordinarily available to others resident in the country.

8 C.F.R. § 208.15.

■ Under this scheme, the government initially bears the burden of establishing that a petitioner firmly resettled. *See Sall,* 437 F.3d at 234. If the government persuades the IJ that the petitioner firmly resettled and the evidence is legally sufficient to support that conclusion, then the burden shifts to the petitioner to establish an exception noted in the regulation. *See* 8 C.F.R. § 208.15; *Sall,* 437 F.3d at 234.

■ The IJ erred as a matter of law in ruling that Makadji firmly resettled. To reach the conclusion that Makadji was firmly resettled, the IJ relied largely on the absence of evidence rebutting permanent resettlement, rather than on evidence establishing the fact of permanent resettlement. For example, the IJ emphasized,

> No evidence has been offered to this Court to establish that the Malian government intends on repatriating or deporting his family.... No evidence has been offered to indicate that his parents are living a surreptitious[ ] existence in Mali.... [Makadji] has not established that his entry into Mali and his habitation in Mali [were] only as long as was necessary to arrange onward travel.... [Makadji] has offered no objective evidence to establish that the Malian government is engaged in wholesale repatriation or deportation of Mauritanian citizens.

It is clear that the IJ's finding of firm resettlement depended largely on Makadji's failure to offer convincing evidence that

he was not firmly resettled. The IJ, in other words, effectively placed the burden of proof on the question on Makadji and found against him because of his failure to carry that burden. Furthermore, without reliance on inferences from Makadji's failure to offer evidence to the contrary, the record could not support the conclusion that Makadji was welcome to remain in Mali on a permanent basis.

■ It is not entirely clear, and we need not decide in this case, what the government would need to show in order to establish permanent resettlement. Regulation § 208.15 speaks of an "offer of permanent resident status, citizenship, or some other type of permanent resettlement." Many courts to consider the question have nonetheless assumed that the government's burden can be satisfied without need to show a formal or express "offer," if the circumstances of the person's existence in a country demonstrate that the person was effectively accepted by that nation as a permanent resident. *See Sall,* 437 F.3d at 232; *Mussie v. INS,* 172 F.3d 329, 331 (4th Cir.1999). The evidence here showed no such thing.

The positive evidence on which the IJ relied was primarily the fact that Makadji had remained ten years in Mali (and his family remained there longer after his departure). Additional facts noted by the IJ were that Makadji had worked "odd jobs" in Mali to earn money, the family had lived throughout the stay in Mali in a room in the house of a man who had charitably offered them shelter, and Makadji's father had gone to the Mauritanian embassy in Mali to obtain a Mauritanian identity card for Makadji.

■■ The duration of Makadji's stay in Mali was by itself insufficient to support the IJ's conclusion. While the duration of a refugee's stay in another country can be

significant in establishing that the refugee was permanently welcome there, it is not sufficient. *See Sall,* 437 F.3d at 235 ("[T]he mere passage of four years, standing alone, does not constitute firm resettlement."). Before duration of stay can logically demonstrate that the nation of refuge has accepted the fugitive as a permanent resident, the circumstances must support the inference either that its relevant authorities were at least aware of the refugee's presence, *see, e.g., Mussie,* 172 F.3d at 331–32 (upholding finding that petitioner firmly resettled in Germany where she lived for six years and received government assistance, worked, paid taxes and rented an apartment); *Farbakhsh v. INS,* 20 F.3d 877, 882 (8th Cir.1994) (upholding finding that petitioner firmly resettled in Spain where he lived nearly four years and had applied for refugee status), or that it somehow accepted as permanent a class of persons to which he belongs, *see, e.g., Chinese Am. Civic Council v. Attorney General,* 566 F.2d 321, 328 & n. 17 (D.C.Cir. 1977) (upholding finding that petitioners firmly resettled in Hong Kong where they lived sixteen to twenty years and were among a class of refugees accepted by the government for unconditional residence). It is not unusual for refugees seeking shelter from persecution to enter a new country without their entry being recorded and to earn their living in a sub-rosa, cash economy without generating official records of their presence. *See, e.g., Sall,* 437

F.3d at 231; *Diallo v. Ashcroft,* 381 F.3d 687, 691 (7th Cir.2001). The fact that a refugee spends years in a country of refuge without his presence being known to the relevant authorities of the government would in no way support a logical inference that the country had extended the privilege of permanent residence.

Thus, courts have required more than mere duration of refuge to support the conclusion that permanent resettlement was established. In *Sall,* we considered the case of another black refugee from persecution in Mauritania who was forcibly expelled by soldiers at gunpoint. 437 F.3d at 231. Sall was forced to cross the border into Senegal. *Id.* He spent more than five years in Senegal, staying four and a half years in a refugee camp, then making his way to Dakar where he earned tips for nine months by unloading and carrying goods, and finally found passage to the United States where he sought asylum. *Id.* In a ruling quite similar to the one before us, the IJ denied asylum, concluding that Sall was ineligible because he was "firmly resettled" in Senegal before seeking asylum in the United States. *Id.* at 232. After endorsement of the IJ's ruling by the BIA, we vacated and remanded because the finding of firm resettlement was not supported by substantial evidence and the IJ erred in placing the burden of proof on the issue on Sall. *Id.* at 233–35. Our reasoning in this case is similar.[3]

---

**3.** We acknowledge a seemingly contradictory footnote in the *Sall* opinion, which states in dictum, "we agree with our sister circuits [*Cheo v. INS,* 162 F.3d 1227 (9th Cir.1998), and *Chinese Am. Civic Council v. Attorney General,* 566 F.2d 321 (D.C.Cir.1977)] that have held that a lengthy, peaceful stay in a third country creates a presumption of firm resettlement that an applicant has the burden to rebut." 437 F.3d at 234 n. 6. This reference to a "lengthy, peaceful stay" cannot, however, be read in isolation. Sall lived a seemingly peaceful, although meager, exis-

tence for over five years in Senegal; nonetheless, we found absence of substantial evidence to support an inference of firm resettlement and ruled that the burden of proof on the issue remained on the government. The footnote in *Sall* concludes saying that "Sall's stay in Senegal does not appear to have been sufficiently 'undisturbed' and 'peaceful' to create a presumption of firm resettlement, notwithstanding the five-year length of his stay." 437 F.3d at 234 n. 6. There was no evidence of any governmental interference or

The Seventh Circuit reached a similar decision in *Diallo*, 381 F.3d 687, another case of a refugee from Mauritania. Diallo was expelled from Mauritania into Senegal, where he spent four years "selling small things and living with a former acquaintance from Mauritania in a rented apartment.... [H]e had neither a work permit nor official permission to remain there, [but] was not bothered by the Senegalese government." *Id.* at 691 (quotation marks omitted). Diallo's circumstances in the country of putative resettlement were very similar to those of Sall, and of Makadji. The IJ and the BIA found firm resettlement in Senegal, which barred grant of asylum. *Id.* at 691–92. After extensive discussion, the Seventh Circuit rejected this ruling. Quoting the Third Circuit in the case of *Abdille v. Ashcroft*, 242 F.3d 477, 487 (3d Cir.2001), the court explained, "[A]bsent some government dispensation, an immigrant who surreptitiously enters a nation without its authorization cannot obtain official resident status no matter his length of stay, his intent, or the extent of the familial and economic conditions he develops. Citizenship or perma-

nent residency cannot be gained by adverse possession." *Diallo*, 381 F.3d at 693.

The other facts upon which the IJ relied, in addition to the duration of Makadji's stay in Mali, added little or no support for the conclusion that Mali had granted him permanent residence. There was no showing that the government of Mali had any record of his presence there. His entry apparently was not recorded when Mauritanian soldiers forced him across the border; nor was there evidence supporting an inference that the government ever learned of his presence. The IJ noted three facts: that Makadji "worked odd jobs," that his family "resided in a home," and that Makadji's father obtained identity papers for him from the Mauritanian embassy. As for his earning pay by work, there was no evidence suggesting that his employment was known to the government. To the contrary, Makadji's work was odd jobs, presumably paid in cash (there was no evidence to the contrary), which would have created no visible record. It is true as the IJ said that the family lived "in a home," but it was not

threat to the peace of Sall's existence while he was in Senegal. Indeed, the footnote clearly intends to note deficiencies in the government's evidence, which prevented a finding of firm resettlement. As we understand it, the deficiency lay in the government's failure to show, in addition to the duration of Sall's stay in Senegal, evidence either that the Senegal government was aware of his presence and accepted it or had adopted any sort of official policy of permanent acceptance of such refugees. We therefore believe the dictum in the *Sall* footnote must be understood not as a contradiction of the *Sall* holding, but rather as confirming the essential proposition of the holding that duration of residence alone will not discharge the government's burden of showing firm resettlement unless accompanied by circumstances which will logically support the inference that the government of that country has consented to permanent settlement.

The authorities from other circuits which are cited in the footnote are consistent with this interpretation. As for *Chinese American*, the inference of permanent resettlement of the Chinese refugees in Hong Kong did not depend solely on the duration of their stay, but rather on the Hong Kong Immigration Ordinance of 1971, which effectively granted residence to persons of Chinese race who had resided in Hong Kong for seven years. 566 F.2d at 328 & n. 17. And as for *Cheo*, it was decided in 1998 under a regulation no longer in effect, 8 C.F.R. § 208.14(c) (1995 version), which provided that "if a ground for denial of asylum, such as firm resettlement, 'may apply,' the applicant has the burden of proving by a preponderance of the evidence that the ground does not apply." *Cheo*, 162 F.3d at 1229. Accordingly, under the regulatory scheme which applied at the time, the burden with respect to resettlement was on the petitioner, not on the government.

their home. So far as the evidence showed, out of pity a man provided the family with a room in his house. Once again, nothing about this arrangement in any way supports an inference that the government was aware of their presence in the country and agreed to its permanence. And as for the identity document obtained for Makadji by his father, it was not obtained from the Mali government, but from the Mauritanian embassy. The fact that Makadji's father obtained an identity card for him from the Mauritanian government in no way supports the proposition that the Mali government was aware of his presence, much less agreed to make it permanent.

In short, as stated above, even when reviewed under the liberal substantial evidence test, the evidence was insufficient to support an inference that Makadji was accorded permanent resettlement in Mali. We cannot state with confidence that the IJ would have made the same decision (of firm resettlement) in the absence of the errors, particularly because of the erroneous placement of the burden on Makadji and because Makadji's evidence, which the IJ generally credited, quite clearly indicated the contrary. We must accordingly vacate the finding of firm resettlement and remand for reconsideration.

## II. *Withholding of Removal*

■ The agency's denial of Makadji's claim for withholding of removal was also in error, because the IJ did not shift the burden of proof to the government with respect to likelihood of persecution in Mauritania upon Makadji's showing of past persecution. Makadji offered credible testimony that he was beaten and deported at gunpoint from Mauritania. The IJ characterized Makadji's deportation as "past persecution," but denied Makadji's claim because Makadji failed to establish that it is

clearly probable that he will be harmed if he returns to Mauritania. Once Makadji showed that he suffered past persecution, however, the burden of proof should have shifted to the government. *See* 8 C.F.R. § 208.16(b)(1)(ii). The government bore the burden of establishing by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that [Makadji's] life or freedom would not be threatened on account of [race] upon [Makadji's] removal to [Mauritania]." *See id.* at § 208.16(b)(1)(i)(A). Because the IJ did not shift the burden from Makadji to the government upon his showing of past persecution, the denial of withholding of removal was in error.

## Conclusion

For the foregoing reasons, we vacate the decision of the agency and remand for rehearing.