*Garcia-Aranda v. Garland*

# United States Court of Appeals
# For the Second Circuit

August Term 2021

Argued:  January 20, 2022
Decided: November 21, 2022

No. 18-2281

KARLA IVETH GARCIA-ARANDA,

*Petitioner,*

*v.*

MERRICK B. GARLAND, UNITED STATES
ATTORNEY GENERAL,

*Respondent.*

Petition from the Board of Immigration Appeals
No. A206-716-166.

Before:     KEARSE, WALKER, and SULLIVAN, *Circuit Judges.*

Karla Iveth Garcia-Aranda petitions for review of two decisions of the Board of Immigration Appeals ("BIA") denying asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").  Garcia-Aranda, a native and citizen of Honduras, testified before an Immigration Judge ("IJ") that she and her family had been threatened, kidnapped, and beaten by members of the Mara 18 gang while a local Honduran police officer was present.  Garcia-Aranda sought asylum and withholding of removal, arguing that the gang had persecuted her

because she was a member of the Valerio family, which ran its own drug trafficking ring in Garcia-Aranda's hometown. She also sought protection under CAT based on an asserted likelihood of future torture at the hands of the gang with the participation or acquiescence of the local Honduran police. Having reviewed both the IJ's and the BIA's opinions, we hold that the agency did not err in finding that Garcia-Aranda failed to satisfy her burden of proof for asylum and withholding of removal, but that the agency applied incorrect standards when adjudicating Garcia-Aranda's CAT claim. Accordingly, the petition for review is **DENIED IN PART** and **GRANTED IN PART**, the decisions of the BIA are **VACATED IN PART** to the extent they denied Garcia-Aranda's claim for CAT protection, and the case is **REMANDED** to the BIA for further proceedings consistent with this decision.

DENIED IN PART, GRANTED IN PART, VACATED IN PART, AND REMANDED.

HEATHER AXFORD (Rebecca Press, Paola Donovan, *on the brief*), Central American Legal Assistance, Brooklyn, NY, *for Petitioner*.

BEAU BAUMANN (Joseph H. Hunt, Patricia A. Smith, Victor M. Lawrence, *on the brief*), United States Department of Justice, Washington, DC, *for Respondent*.

Christopher P. Malloy, Sophia M. Mancall-Bitel, Amber R. Will, New York, NY, *for Amici Curiae* Brooklyn Defender Services, The Bronx Defenders, Erie County Bar Association Volunteer Lawyers Project, The Legal Aid Society, and The Prisoners' Legal Services of New York.

RICHARD J. SULLIVAN, *Circuit Judge*:

Karla Iveth Garcia-Aranda petitions for review of two decisions of the Board of Immigration Appeals ("BIA") denying asylum, withholding of removal, and

2

relief under the Convention Against Torture ("CAT"). Garcia-Aranda, a native and citizen of Honduras, testified before an Immigration Judge ("IJ") that she and her family had been threatened, kidnapped, and beaten by members of the Mara 18 gang while a local Honduran police officer was present. Garcia-Aranda sought asylum and withholding of removal, arguing that the gang had persecuted her because she was a member of the Valerio family, which ran its own drug trafficking ring in Garcia-Aranda's hometown. She also sought protection under CAT based on an asserted likelihood of future torture at the hands of the gang with the participation or acquiescence of the local Honduran police. Having reviewed both the IJ's and the BIA's opinions, we hold that the agency did not err in finding that Garcia-Aranda failed to satisfy her burden of proof for asylum and withholding of removal, but that the agency applied incorrect standards when adjudicating Garcia-Aranda's CAT claim. Accordingly, the petition for review is **DENIED IN PART** and **GRANTED IN PART**, the BIA's decisions are **VACATED IN PART** to the extent that they denied CAT protection, and the case is **REMANDED** to the BIA for further proceedings consistent with this decision.

## I. BACKGROUND

### A. Factual Background[1]

Prior to fleeing Honduras, Garcia-Aranda lived with her husband and two children in the village of San Juan, in the municipality of Tela and in the department of Atlantida. Although Garcia-Aranda and her parents were law-abiding citizens, she acknowledged that most of her extended family was involved in drug trafficking in Honduras – led by her great uncle, Jorge Valerio. Beginning in 2008, members of the Mara 18 gang began killing members of the Valerio family, including Jorge Valerio, because of their involvement in drug trafficking and their refusal to pay a "war tax" to the gang. The gang also killed Garcia-Aranda's stepfather, who was not involved in the Valerio drug operation, due to his relationship with the family.

After the gang murdered her aunt in 2010, Garcia-Aranda moved with her husband and children to Tegucigalpa, Honduras to escape the violence. They returned to San Juan three years later, after hearing that the Valerio family had ceased selling drugs and that the dispute with the gang had subsided. Back in San Juan, Garcia-Aranda and her husband opened two businesses, one selling food

---

[1] The factual background presented here is derived from the Certified Administrative Record and factual findings of the IJ, which are not disputed on appeal.

4

and one transporting local children to school. But the Mara 18 gang soon approached Garcia-Aranda – first to gain information on the whereabouts of an uncle involved in drug trafficking, and later to demand that Garcia-Aranda and her husband pay a "quota," or extortion payment, based on the belief that the couple had money from their businesses and from an inheritance from Jorge Valerio. For about six months, Garcia-Aranda and her husband paid the "quota," but then stopped after their businesses' sales declined.

Garcia-Aranda and her husband then fled to Mexico, but in 2014, they returned to San Juan after being deported. Almost immediately thereafter, a group of Mara 18 gang members kidnapped Garcia-Aranda, her husband, and her children and again demanded money in light of her purported inheritance from Jorge Valerio. The gang held Garcia-Aranda and her family for three days, during which time they deprived her of food and repeatedly beat her husband. During her captivity, Garcia-Aranda recognized the voice of a local police officer, whom she knew because he had previously come to Jorge Valerio's home to collect money. After Garcia-Aranda's mother paid a portion of the ransom, the gang released the family.

**B.    Procedural History**

In June 2014, following the kidnapping, Garcia-Aranda and her two

5

children entered the United States without inspection. They were apprehended at the border and were served by the Department of Homeland Security with notices to appear charging them with removability pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). Through counsel, and with Garcia-Aranda participating as lead applicant, the family conceded removability as charged and timely applied for asylum, withholding of removal, and protection under CAT.[2] At a later merits hearing before the IJ, Garcia-Aranda testified to the events discussed above. Garcia-Aranda also submitted exhibits pertaining to the country conditions in Honduras – including the U.S. Department of State's 2015 Country Report on Human Rights Practices for Honduras and Douglas Farah's "Central America's Northern Triangle: A Time of Turmoil and Transition," which chronicled the sources of corruption, violence, criminal activity, and governmental abuse in Honduras.

On September 6, 2016, despite finding that Garcia-Aranda had testified credibly, the IJ denied the family's applications for asylum, withholding of removal, and CAT relief and ordered their removal to Honduras. The IJ found

[2] As alluded to above, Garcia-Aranda's two children were included as derivative beneficiaries in her removal proceedings. They were also originally included as petitioners here, but their cases have been severed and remanded.

that Garcia-Aranda failed to satisfy her burden for asylum or withholding of removal because her proposed social group (members of the Valerio family in San Juan, Tela, Atlantida, Honduras) did not constitute a "particular social group," as required by 8 U.S.C. § 1101(a)(42). Alternatively, the IJ found that, even if the Valerio family did qualify as a "particular social group," Garcia-Aranda did not establish that her affiliation with the family was "at least one central reason" why gang members had targeted her, as required by 8 U.S.C. § 1158(b)(1)(B)(i). Instead, the IJ concluded that the gang had targeted her due to a perception that she was wealthy. Finally, as for CAT relief, the IJ noted Garcia-Aranda's "credible testimony that there was a police officer who was involved in some of the past incidents," but determined that Garcia-Aranda failed to "demonstrate that it is 'more likely than not' that she would be harmed by governmental forces or forces the government is unable or unwilling to control in a way that constitutes torture as that term has been defined." Certified Admin. Record at 90–91.

Garcia-Aranda appealed to the BIA, which dismissed the appeal on June 30, 2017. With respect to her asylum and withholding of removal claims, the BIA agreed with the IJ that Garcia-Aranda did not show the legally required nexus between her membership in her proposed social group and her fear of harm. With

7

respect to CAT relief, the BIA concluded that Garcia-Aranda's "testimony, along with the evidence of widespread corruption and violence . . . , does not establish that a public official of the government of Honduras would acquiesce in [Garcia-Aranda's] torture, or that she faces a more likely than not chance of torture in the first place." *Id.* at 30. Garcia-Aranda timely petitioned for review of the BIA decision pursuant to 8 U.S.C. § 1252, but the parties subsequently stipulated under Federal Rule of Appellate Procedure 42(b) to dismiss the petition and remand to the BIA so that it could reconsider certain aspects of its CAT analysis, which we so-ordered.

On remand, the BIA again dismissed Garcia-Aranda's appeal in a July 9, 2018 decision. Because the parties' stipulation and our ensuing order did not reference the BIA's prior asylum and withholding of removal determinations, the BIA addressed only relief under CAT. Ultimately, the BIA concluded that, "[a]ssuming that the kidnapping and other past mistreatment . . . described [by Garcia-Aranda] constitutes torture, we agree [with the IJ] that she has not shown a likelihood of future torture by or with the acquiescence (including willful blindness) of a government official upon return." Certified Admin. Record at 4. The BIA explained that "the evidence does not support a finding that the police

8

officer in question or any Honduran official has an interest in torturing the respondent at this time or that members of the police, either alone or in connection with gangs or cartels, routinely engage in kidnapping for ransom and associated mistreatment and that higher officials know or remain willfully blind to the conduct and breach their responsibility to prevent it." *Id.* (citing *Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004)).

Garcia-Aranda now again timely petitions for review of the BIA's decision pursuant to 8 U.S.C. § 1252.[3]

## II.    DISCUSSION

Because the BIA did not expressly adopt the IJ's decision, but "its brief opinion closely track[ed] the IJ's reasoning," we have reviewed the opinions of both the IJ and the BIA "for the sake of completeness." *Pan v. Holder*, 777 F.3d 540, 543 (2d Cir. 2015) (internal quotation marks omitted).  We review the IJ's factual findings under the substantial evidence standard, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (internal quotation marks omitted).  We review de novo questions

---

[3] The parties do not dispute that the BIA's June 30, 2017 decision (with respect to the asylum and withholding of removal determinations) and the BIA's July 9, 2018 decision (with respect to the CAT determination) are both properly before us.  Gov't Br. at 3.

of law and the application of law to undisputed facts, but the BIA's interpretations of immigration regulations are reviewed with substantial deference, unless an interpretation is plainly erroneous or inconsistent with the regulation. *See Bah v. Mukasey*, 529 F.3d 99, 110–11 (2d Cir. 2008).

Before this Court, Garcia-Aranda advances two main arguments. First, she contends that, for her asylum and withholding of removal claims, the BIA erred in concluding that (even assuming the validity of her proposed social group, the Valerio family) she had failed to establish the legally required nexus between her membership in that group and her fear of harm. Second, she argues that, for her CAT claim, the BIA erred in concluding that she had failed to establish that she would more likely than not be tortured in Honduras by or with the acquiescence of a public official upon her return. We address each of these arguments in turn.

## A. Asylum and Withholding of Removal

An applicant for asylum and withholding of removal "must establish that race, religion, nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i); *see also id.* § 1231(b)(3)(A); *Quituizaca v. Garland*, 52 F.4th 103, 105–06 (2d Cir. 2022); *Matter of C-T-L-*, 25 I. & N. Dec. 341, 344–48 (B.I.A. 2010). In cases where there is more than one motive for mistreatment (also known as

10

mixed-motive cases), the "at least one central reason" statutory requirement still stands; in other words, an applicant's status as a member of a particular social group still must be at least one of the central reasons, rather than a minor reason, for why that individual is being targeted. *See Acharya v. Holder*, 761 F.3d 289, 296–98 (2d Cir. 2014); *Castro v. Holder*, 597 F.3d 93, 104 (2d Cir. 2010); *Matter of N-M-*, 25 I. & N. Dec. 526, 530–31 (B.I.A. 2011).

When a proposed social group is based on family ties, these same basic principles apply. *See Matter of L-E-A-*, 27 I. & N. Dec. 40, 43–47 (B.I.A. 2017), *rev'd in part on other grounds*, 27 I. & N. Dec. 581, 596–97 (A.G. 2019). "[T]he fact that a persecutor has threatened an applicant and members of his [or her] family does not necessarily mean that the threats were motivated by family ties." *Id.* at 45. Instead, because membership in the family cannot be a minor, incidental, or tangential reason for the harm, "the fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground." *See id.* at 44–46; *see also, e.g.*, *Arias-Avila v. Garland*, 855 F. App'x 54, 55 (2d Cir. 2021); *Gonzalez-Carias v. Garland*, 855 F. App'x 52, 53 (2d Cir. 2021); *Barrera Pacheco v. Barr*, 836 F.

11

App'x 22, 24 (2d Cir. 2020).[4]

Here, the agency did not err in finding that Garcia-Aranda failed to show that her membership in the Valerio family was a central, rather than tangential or incidental, reason that the Mara 18 gang targeted her. The record reflects that gang members killed several Valerio family members on account of their involvement in the drug trade and refusal to pay extortion, and that Garcia-Aranda and her husband were targeted several years later because the gang perceived them to have wealth based on their ownership of two businesses and inheritance from Valerio family members. This supplies substantial evidence for the agency's conclusion that Garcia-Aranda was targeted for extortion and kidnapping based on her perceived ability to pay, and that animus toward the Valerio family was at most an incidental reason for her targeting. *See Matter of L-E-A-*, 27 I. & N. Dec. at 44–47; *see also Ucelo-Gomez v. Mukasey*, 509 F.3d 70, 74 (2d Cir. 2007) ("[H]arm motivated purely by wealth is not persecution."). Similarly, the fact that the gang also killed Garcia-Aranda's stepfather, who was not involved in drug trafficking, and once approached Garcia-Aranda seeking the whereabouts of an uncle

---

[4] Numerous other circuits have adopted this standard. *See, e.g., Thalayan v. Att'y Gen. of U.S.*, 997 F.3d 132, 142–44 (3d Cir. 2021); *Orellana-Recinos v. Garland*, 993 F.3d 851, 856–59 (10th Cir. 2021); *Sanchez-Castro v. U.S. Att'y Gen.*, 998 F.3d 1281, 1286–88 (11th Cir. 2021); *Fuentes v. Barr*, 969 F.3d 865, 871–72 (8th Cir. 2020).

involved in drug trafficking – without more to indicate that these occurrences were due to animus against the Valerio family and not the perceived wealth of the Valerio family – does not undermine the substantial evidence supporting the agency's conclusion.

Accordingly, we deny the petition for review as to Garcia-Aranda's claims for asylum and withholding of removal.

## B.    CAT Claim

Unlike asylum and withholding of removal, CAT relief does not require a nexus between the alleged torture and an applicant's membership in a protected group.  Instead, Article III of CAT, as implemented by the United States, prohibits the government from removing an applicant if it is "more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2) (2022); 8 C.F.R. § 1208.16(c)(2) (2018) (same);[5] *see also Mu-Xing Wang*

---

[5] For the purposes of this case, whether considering the current version of CAT-implementing regulations (labeled with a 2022 parenthetical), or the version in effect at the time of the IJ's and the BIA's decisions (labeled with a 2018 parenthetical), we would reach the same conclusions. After the IJ's and the BIA's decisions in this case, a new version of the CAT-implementing regulations was promulgated in December 2020, with a set effective date of January 11, 2021.  *See* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80,274 (Dec. 11, 2020).  But on January 8, 2021, before the new version of the regulations could take effect, a district court in California preliminarily enjoined their implementation, enforcement, and application.  *See Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966 (N.D. Cal. 2021).  The current version of the CAT-implementing regulations was then promulgated in March 2022, with an effective date of May 31, 2022.  *See*

*v. Ashcroft*, 320 F.3d 130, 144 n.20 (2d Cir. 2003).

Analysis of a CAT claim boils down to a two-step inquiry. *See, e.g.*, *Garcia v. Holder*, 756 F.3d 885, 891 (5th Cir. 2014); *Garcia-Milian v. Holder*, 755 F.3d 1026, 1033 (9th Cir. 2014). First, the applicant must show that, in his or her particular situation, it is more likely than not that he or she will be harmed upon removal in a way recognized by section 1208.18(a). *See, e.g.*, *Zelaya-Moreno v. Wilkinson*, 989 F.3d 190, 203–05 (2d Cir. 2021); *Banegas Gomez v. Barr*, 922 F.3d 101, 109–10 (2d Cir. 2019); *Mu Xiang Lin v. U.S. Dep't of Just.*, 432 F.3d 156, 160 (2d Cir. 2005). Generally speaking, this means that the applicant must show that he or she will more likely than not be subject to "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . intimidating or coercing him or her or a third person." 8 C.F.R. § 1208.18(a)(1) (2022); *see also id.* § 1208.18(a)(2)–(6) (2022); 8 C.F.R. § 1208.18(a) (2018) (same); *Zelaya-Moreno*, 989 F.3d at 204 ("Whether . . . acts of violence rise to the level of torture depends on the interplay between many factors, including severity, duration, effects, and means of carrying them out."). In assessing the likelihood of future harm, the agency must consider "all evidence relevant to the possibility

Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18,078 (Mar. 29, 2022).

14

of future torture . . . including, but not limited to: (i) [e]vidence of past torture . . . ; (ii) [e]vidence that the applicant could relocate . . . ; (iii) [e]vidence of gross, flagrant or mass violations of human rights . . . ; and (iv) [o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3) (2022); 8 C.F.R. § 1208.16(c)(3) (2018) (same).

Second, for an applicant to be eligible for CAT relief, the applicant must also show that sufficient state action, as defined in section 1208.18(a), would be involved in his or her likely future harm. In other words, the applicant must show that his or her likely future harm will be "inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (2022); 8 C.F.R. § 1208.18(a)(1) (2018) (materially similar). Acquiescence is satisfied where the government actor "know[s] of or remain[s] willfully blind to an act and thereafter breach[es] their legal responsibility to prevent it." *Khouzam*, 361 F.3d at 171; *see also De La Rosa v. Holder*, 598 F.3d 103, 109–10 (2d Cir. 2010); *Delgado v. Mukasey*, 508 F.3d 702, 708–09 (2d Cir. 2007); 8 C.F.R. § 1208.18(a)(7) (2022).

As for who qualifies as a government actor, the Attorney General and our sister circuits have interpreted the regulation's reference to public officials (or

15

other persons) "acting in an official capacity" to mean any public official at any level of government (or any other person) acting "under color of law," as that phrase is used in the civil-rights context. *See Matter of O-F-A-S-*, 28 I. & N. Dec. 35, 39–42 (A.G. 2020); *In re Y–L*, 23 I. & N. Dec. 270, 279, 285 (A.G. 2002); *see also, e.g.*, *Garcia*, 756 F.3d at 891–93; *United States v. Belfast*, 611 F.3d 783, 808–09 (11th Cir. 2010); *Ramirez-Peyro v. Holder*, 574 F.3d 893, 899–901 (8th Cir. 2009); *Bankole v. INS*, 126 F. App'x 503, 504 (2d Cir. 2005).[6] We agree and thus now hold that the CAT state-action requirement mandates that an applicant's likely future torture be performed by, or with the acquiescence of, *any* public official (or other person) "exercis[ing] power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Screws v. United States*, 325 U.S. 91, 111 (1945) ("It is clear that under 'color' of law means under 'pretense' of law."). Although acts of officials in the ambit of

---

[6] The current version of section 1208.18(a)(1) makes the connection between the concepts of "official capacity" and "color of law" even more explicit, explaining that "[p]ain or suffering inflicted by a public official who is not acting under color of law shall not constitute pain or suffering inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity, although a different public official acting in an official capacity or other person acting in an official capacity could instigate, consent to, or acquiesce in the pain or suffering inflicted by the public official who is not acting under color of law." 8 C.F.R. § 1208.18(a)(1) (2022).

16

their personal pursuits are plainly excluded, whether any particular official's actions ultimately satisfy this standard is a fact-intensive inquiry, as "there is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law." *Pitchell v. Callan*, 13 F.3d 545, 547–49 (2d Cir. 1994); *see also, e.g.*, *United States v. Giordano*, 442 F.3d 30, 42–47 (2d Cir. 2006); *Monsky v. Moraghan*, 127 F.3d 243, 245–46 (2d Cir. 1997).

Here, based primarily on the past kidnapping incident in which a local police officer was present, *see* Certified Admin. Record at 163–67, 171–77, and country-conditions evidence allegedly showing regular collusion between gangs and police, *see, e.g., id.* at 417, 431, Garcia-Aranda seeks CAT protection on the theory that, upon her return to Honduras, the Mara 18 gang will likely subject her to harm cognizable as torture under section 1208.18(a). Thus, applying the standards articulated above to this theory of CAT relief, the agency must answer two key questions based on the evidence: whether, if Garcia-Aranda were to be removed to Honduras, it is more likely than not (1) that the gang will intentionally inflict severe pain or suffering to intimidate or coerce her, including meeting all the harm requirements for torture under section 1208.18(a); and (2) that local police *acting under color of law* will either (i) themselves participate in those likely

17

gang actions or (ii) acquiesce in those likely gang actions. *See Ramirez-Peyro*, 574 F.3d at 901–06 (the Eighth Circuit conducting requisite color-of-law analysis on facts similar to this case).

Thus far, the agency at all levels has failed to make these required determinations. For her part, the IJ found that Garcia-Aranda failed to "demonstrate that it is 'more likely than not' that she would be harmed by governmental forces or forces the government is unable or unwilling to control in a way that constitutes torture as that term has been defined," seemingly applying the "unable or unwilling to protect" acquiescence standard applicable to asylum and withholding of removal claims, rather than the standard applicable to CAT claims. Certified Admin. Record at 90–91; *see also Scarlett v. Barr*, 957 F.3d 316, 336 (2d Cir. 2020) (remanding for the agency to explain how the distinct unable-or-unwilling standard "might translate to identifying government acquiescence in torture under the CAT").

To be sure, the BIA came closer to the standard we announce today when it required Garcia-Aranda to show "a likelihood of future torture by or with the acquiescence (including willful blindness) of a government official upon return." Certified Admin. Record at 4. But the BIA then fatally erred when, parroting

18

language from *Khouzam*, 361 F.3d 161, it faulted Garcia-Aranda for failing to show either that "*the police officer in question or any Honduran official* has an interest in torturing the respondent at this time" or that "members of the police, either alone or in connection with gangs or cartels, routinely engage in kidnapping for ransom and associated mistreatment and that *higher officials* know or remain willfully blind to the conduct and breach their responsibility to prevent it." Certified Admin. Record at 4 (emphases added). In other words, the BIA failed to analyze whether it is likely that *the Mara 18 gang* has an interest in torturing Garcia-Aranda at this time and whether it is likely that *any member of the local police who is acting under color of law* will participate in, or acquiesce in, that conduct.

In *Khouzam*, we analyzed whether a man accused of murder in Egypt, where torture was regularly used as an interrogation tactic, was eligible for CAT relief. 361 F.3d at 163–64, 169. Although we indicated that section 1208.18(a)'s state-action requirement was likely met because the interrogating police officers were themselves "acting in their official capacities . . . as [was] strongly suggested by the fact that their goal [was] to extract confessions," we also held that, to the extent that the interrogating police officers were not acting in their official capacities, evidence of the "'routine' nature of the torture and its connection to the criminal

19

justice system" meant that other police officers – in that case higher-level police officers – would meet section 1208.18(a)'s state-action requirement through acquiescence. *Id.* at 171. But we never indicated that such facts are necessary. Where, as here, the primary perpetrator of likely harm is a gang, the relevant state-action question (should the BIA reach it) is whether any public official, or any other person, including low-level local police officers, when acting under color of law, will participate or acquiesce in harm that the gang is likely to inflict and that is recognized as torture under section 1208.18(a).

Because of these legal errors, we grant the petition as to Garcia-Aranda's claim for protection under CAT and vacate the BIA's decisions regarding CAT protection. *See Rafiq v. Gonzales*, 468 F.3d 165, 166–67 (2d Cir. 2006) (remanding a CAT claim for proper application of *Khouzam*). On remand, we direct the agency to consider, in light of all testimony and documentary evidence, whether Garcia-Aranda will more likely than not be tortured by, or at the instigation of, or with the consent or acquiescence of, any public official (or other person) acting under color of law. As more fully described above, that means considering questions such as whether it is more likely than not that the gang will torture Garcia-Aranda, including meeting all the harm requirements for torture under section 1208.18(a),

20

and whether it is more likely than not that local police acting under color of law will themselves participate in those likely gang actions or acquiesce in those likely gang actions. The BIA is also instructed to remand to the IJ for any additional factfinding that is necessary for the BIA to make its determination.

### III. CONCLUSION

For the foregoing reasons, we **DENY IN PART** and **GRANT IN PART** the petition for review, **VACATE** the BIA's decisions regarding CAT protection, and **REMAND** the case to the BIA for further proceedings consistent with this opinion.[7]

---

[7] On September 10, 2018, Garcia-Aranda filed a motion seeking a stay of removal during the pendency of her claim before this Court. Doc. No. 15. We hereby deny that motion as moot.