*B.G.S. v. Bondi*

In the

# United States Court of Appeals

For the Second Circuit

August Term 2024

(Argued: October 30, 2024     Decided: November 24, 2025)

No. 23-6862

B.G.S.,

*Petitioner*,

−v.−

PAMELA BONDI, UNITED STATES ATTORNEY GENERAL,

*Respondent*.[*]

Before:     KEARSE, SULLIVAN, and ROBINSON, *Circuit Judges*.

Petitioner B.G.S. petitions for review of a decision by the Board of Immigration Appeals ("BIA") denying him relief under the Convention Against Torture ("CAT"). B.G.S., a native and citizen of Guatemala, testified before an Immigration Judge ("IJ") that members of Mara Salvatrucha ("MS-13") had attacked him in Guatemala for leaving the gang and that a

---

[*] The Clerk's office is respectfully directed to amend the caption as reflected above.

prominent local police officer with connections to the gang had attacked him because of his romantic involvement with a woman. In addition, B.G.S. testified that he had a tattoo associated with MS-13 that he tried to cover up after leaving the gang. And, the government introduced evidence that there was an outstanding warrant for B.G.S.'s arrest pending in Guatemala.

B.G.S. sought deferral of removal under CAT based on an asserted likelihood of future torture at the hands of the gang with the participation or acquiescence of the Guatemalan government. Having reviewed both the IJ's and the BIA's opinions, we hold that the Agency did not properly assess whether the Guatemalan government would acquiesce to B.G.S. being tortured in prison by private parties who would target him if he returned to Guatemala. Accordingly, the petition for review is **GRANTED**, the BIA's decision is **VACATED**, the pending stay is **VACATED,** and the case is **REMANDED** for further proceedings consistent with this decision.

Judge Sullivan dissents in a separate opinion.

MADELAINE J. HORN, Debevoise & Plimpton LLP, New York, NY (Courtney Dankworth, Michael McGregor, Debevoise & Plimpton LLP, New York, NY; Sayoni Maitra, Julie Dona, The Legal Aid Society, New York, NY, *on the briefs*), *for Petitioner*.

STEPHANIE L. GROFF, Trial Attorney (Brian M. Boynton, Principal Deputy Assistant Attorney General; Cindy S. Ferrier, Assistant Director; Marie V. Robinson, *on the brief*), Office of Immigration Litigation, United States Department of Justice, Washington, DC, *for Respondent*.

ROBINSON, *Circuit Judge*:

Petitioner B.G.S., a native and citizen of Guatemala, seeks review of a July 14, 2023 decision of the Board of Immigration Appeals ("BIA") affirming a

November 17, 2022 decision of an Immigration Judge ("IJ") denying his application for relief under the Convention Against Torture ("CAT"). *In re B.G.S.*, No. A-201-517-888 (B.I.A. July 14, 2023), *aff'g* No. A201-517-888 (Immig. Ct. N.Y. City Nov. 17, 2022). Because we conclude that the BIA and IJ (together, the "Agency") did not properly assess whether the Guatemalan government would acquiesce to B.G.S. being tortured in prison by private parties who would target him if he returned to Guatemala, we **GRANT** B.G.S.'s petition for review, **VACATE** the Agency's denial of relief under the CAT, **VACATE** the pending stay, and **REMAND** for further proceedings consistent with this decision.

## BACKGROUND

### I. Factual Background

*A. MS-13 in Guatemala*

Petitioner B.G.S. presented the following evidence in his hearing before an IJ on his request for protection under the CAT. B.G.S. is a native of Guatemala. He joined a gang known as Mara Salvatrucha ("MS-13") in his home country when he was about eight years old. A couple of years after B.G.S. joined the gang, members of MS-13 tattooed his back with an image called "La mano del Hueso," or "The hand of the Bone," which identified him as an MS-13 member. Certified Administrative Record ("CAR") 465 ¶ 6.

3

In 2019, when B.G.S. was in his early 20s, he decided to leave MS-13 because he wanted a better life for his children. He communicated his intention to a local MS-13 leader known as "Black Demon." At Black Demon's instruction, thirteen MS-13 members beat up B.G.S. with their hands and feet for thirteen seconds, and then let him go so he could reconsider his decision to leave the gang. When B.G.S. subsequently said he had not changed his mind about leaving the gang, Black Demon put a "greenlight" on him granting permission to other gang members to harm or kill B.G.S. CAR 465 ¶ 10.

Following this attack, B.G.S. moved to a town approximately 45 minutes away to distance himself from the gang. But, in his new town, he was approached by three MS-13 members who attacked him with a machete, leaving him badly injured. They stopped beating him up because a neighbor fired a weapon into the air. B.G.S. moved even further away but, despite this second move, he saw Black Demon again; Black Demon shot at him, leaving him with two bullet wounds in his waist and abdomen. At some point, B.G.S. attempted to remove the MS-13 tattoo on his back and cover it up with a tattoo of an owl, but the original tattoo was still visible.

### B. Encounters with A.S.

B.G.S. continued to isolate himself in Guatemala to avoid the gang. He ventured into public only to play for a local soccer club and for necessities. During one of his soccer practices, B.G.S. met a woman with whom he eventually became intimate. B.G.S. later learned that the woman was in a relationship with A.S., a police officer with a lot of power who collaborated with MS-13. A.S. learned of the affair and, as a result, shot at B.G.S. in two different incidents, hitting him under his arm on one occasion. A.S. would also drive around with uniformed police officers in their official vehicles looking for B.G.S. during this time.

### C. Threats in Mexico & B.G.S.'s Arrival in the United States

B.G.S. fled Guatemala in 2020 and moved to Mexico but soon encountered two cartels there, each of which threatened him and tried to coerce him to work for them. B.G.S. eventually left Mexico and entered the United States without inspection around July 2021.

## II. Procedural History

In October 2021, B.G.S. pled guilty to assault in the third degree in Suffolk County Court and was sentenced to seven months' imprisonment. Upon his release, the Department of Homeland Security served B.G.S. with a Notice to Appear before the immigration court and charged him with removability

pursuant to the Immigration and Nationality Act.  B.G.S. applied for deferral of removal pursuant to CAT.[1]

*A. Immigration Court Hearings*

Following a competency hearing, the IJ found B.G.S. to be competent but adopted safeguards for B.G.S.'s testimony to mitigate concerns regarding his ability to testify in light of a trauma-related mental health condition.[2]  The IJ held merits hearings on B.G.S.'s application on August 5 and November 7, 2022, during which B.G.S., his mother, his brother, and a country conditions expert, Jonathan Rosen, testified.  The government introduced as evidence a September 2020 warrant for B.G.S.'s arrest in Guatemala on suspicion of murder.[3]  B.G.S. feared torture from three different sources: MS-13, which sought to retaliate against him for leaving the gang; the corrupt police officer who would retaliate against B.G.S. for his involvement with the officer's girlfriend; and the Mexican cartels in Guatemala who would do him harm for failing to join them.

---

[1]  In his I-589 Application, B.G.S. also pursued claims for asylum and withholding of removal, but he subsequently withdrew those requests for relief.

[2]  Those safeguards included accepting a detailed affidavit from B.G.S. in lieu of a direct examination, requiring simple and direct questions, and permitting breaks or pauses when necessary.

[3]  The government introduced a bare warrant.  The record contains no information about the underlying allegations or the basis for them.

As relevant here, in addition to B.G.S.'s testimony as to the matters set forth above, B.G.S. presented country conditions evidence regarding MS-13 retaliation against former members who have left the gang, B.G.S.'s particular risk on account of his visibly altered MS-13 gang tattoo, B.G.S's risk of imprisonment upon his return, and the role of gangs within Guatemalan prisons.

In particular, country conditions expert Rosen attested that B.G.S.'s tattoo symbolized his membership in MS-13 and that his attempt to cover up the tattoo would be "viewed as a sign of disrespect by the gang." CAR 588 ¶ 66. He further attested that it is common that "MS-13 will physically harm or even kill" those who have wronged the gang, including someone like B.G.S. who would be perceived as "def[ying] their authority." *Id.* at 588–89 ¶¶ 66–67. In addition, given B.G.S.'s prior dealings with A.S. and the fact that information concerning his outstanding warrant would be shared with the Guatemalan government upon B.G.S.'s removal, Rosen concluded that it was "more likely" that B.G.S. would be labeled a "gang member and targeted by the police." *Id.* at 590 ¶ 71. Rosen placed B.G.S.'s "threat of torture or death as extremely lik[el]y" if he returned to Guatemala. *Id.* at 594 ¶ 82.

Additional evidence corroborated Rosen's declaration. For example, a United States Agency for International Development ("USAID") report on

Guatemala concluded that there was "consistent evidence that individuals face more difficulties when they try to exit the gang in Guatemala" and that the decision to do so "carr[ies] a very high risk of death." CAR 648–49. Another report noted the difficulty individuals may have leaving MS-13, stating that the gang "penalizes desertion with a death sentence" and, even when an individual "can break free of their membership, their tattoos have often branded them for life." *Id.* at 785.

B.G.S. also submitted evidence showing that the risk of gang violence may be greater in the prison context. The USAID report provided a historical account of the politics between MS-13 and Barrio 18, a rival gang, noting this rivalry often plays out in prison, where "gangs connected with different networks" and have "diversified the scope of their criminal activities" over time. *Id.* at 654. The gangs are typically "vertically controlled by senior members" who "often are in prison[,]" reflecting both gang presence and power in Guatemalan prisons. *Id.* at 661.

A 2021 Human Rights Report on Guatemala prepared by the United States Department of State reached a similar conclusion, explaining that "[p]rison conditions" in Guatemala "were harsh and life threatening, with multiple instances of inmates killing other inmates." CAR 800. And, the report noted

prison officials' difficulty in controlling prisons because of "transnational criminal gangs and drug trafficking groups control[ing] major prisons." *Id.*[4]

The "[b]rutality" of gang activity in Guatemala, as a study published by the United States Army War College Press noted, can be especially harsh against "gang members who fall into the hands of their opponents [who] are sometimes tortured or dismembered before being killed." CAR 873. "This is particularly the case in Guatemala's overcrowded prisons, which have increasingly become central arenas for gang-on-gang violence," including one instance of "gang members decapitat[ing] and burn[ing] seven victims in a prison east of Guatemala City." *Id.* A Freedom House report concluded that "[p]rison facilities are grossly overcrowded and rife with gang and drug-related violence and corruption," with conditions being "potentially life threatening, [including] multiple instances of inmates killing other inmates." *Id.* at 923, 931.

And, some country conditions evidence suggested that such gang violence was connected to official corruption. "This rise in violence has been matched by a marked upsurge in official corruption . . . [A]ll serious observers agree that

___

[4] An InSight Crime report noted that the structure of prisons in Guatemala has allowed space for gangs to reorganize within them. CAR 785. "In prison, for example, they are given a freedom and safety that is no longer possible on the outside. They frequently have access to cellular phones, computers and television. As a result, the MS[-]13's Central American branches have been able to rebuild their organizational structures from inside prisons walls, as well as expand their capacity to carry out crimes[.]" *Id.*

9

criminal elements have been hugely successful in penetrating the security forces, judicial institutions, and practically every other office or agency charged with maintaining law and order." CAR 875; *see also id.* at 878 ("Of all the factors inhibiting a successful government response, corruption may be the most important."); *id.* at 769–70 (detailing how the complicity of Guatemalan law enforcement has at times extended to jails, where, for example, a raid that would otherwise suggest government crackdown of gangs in prison was in fact coordinated in advance by the investigating prosecutor and gang leaders). As one publication noted, "To many Guatemalans, . . . the forces of order are not simply ineffective; they are downright malevolent." *Id.* at 881.

### B. IJ's Decision

After the hearings, the IJ denied B.G.S.'s application for relief under CAT. The IJ reasoned that, though B.G.S. testified credibly, his testimony was not persuasive because (1) his pre-hearing written submission stated that Black Demon shot "at" him, but he testified at the hearing that the bullets actually hit him, and (2) B.G.S.'s testimony concerning how MS-13 would find him if he returned to Guatemala was speculative and conclusory. The IJ similarly determined that B.G.S.'s mother's testimony was credible but not persuasive because she "improbably" claimed not to know about B.G.S.'s membership in MS-

13, had not personally witnessed any threats, and testified that she may not have written her own statement submitted prior to the hearings. CAR 139. And, the IJ concluded that B.G.S.'s brother's testimony was credible but not persuasive, noting that his oral testimony that MS-13 members came to his home in Guatemala and made threats against B.G.S. was inconsistent with his written statement that did not mention that those individuals were MS-13 members.

The IJ also concluded that Rosen testified credibly but not persuasively, determining that the expert's testimony was generalized and failed to specifically address the facts of B.G.S.'s case.

The IJ ultimately determined that B.G.S. did not meet his burden of proving that he would be tortured if removed to Guatemala. As to the risk of harm from MS-13, the IJ found B.G.S.'s testimony as to past threats credible but not persuasive, and his corroborating evidence insufficient. The IJ acknowledged medical evidence that B.G.S. had scars consistent with bullet and machete wounds, but found that this evidence did not establish that MS-13 caused the wounds in retribution for B.G.S.'s leaving the gang. The IJ found, "Although there is general evidence of MS-13's violent acts and its tendency to harm ex-gang members, there is insufficient persuasive evidence in the record to establish MS-13, or any other gang, would harm [B.G.S.] upon his return to Guatemala, because, while possible,

11

it is too speculative." CAR 144. As to the risk from A.S., the IJ concluded that there was no persuasive evidence that A.S. was even a police officer or otherwise had connections to the Guatemalan authorities from which he would learn of B.G.S.'s return to Guatemala. And, the IJ concluded there was no sufficiently persuasive evidence that the Mexican cartels were looking for B.G.S.

The IJ recognized that the warrant for B.G.S.'s arrest increases the likelihood that B.G.S. would be arrested upon his return to Guatemala, and acknowledged that prison conditions in Guatemala are "harsh and life threatening," but concluded that it was "not clear from this record that the Guatemalan government is willfully blind to this harm rather than lacking resources." CAR 146. In sum, considering all of the evidence "in the aggregate," the IJ denied B.G.S.'s request for relief under CAT. *Id.* at 147.

In July 2023, the BIA affirmed the IJ's decision for the reasons stated by the IJ. The BIA elaborated on the IJ's conclusion that B.G.S. had failed to establish that any harm he would experience in prison would be "by or with the consent or acquiescence of the Guatemalan government." CAR 7. It acknowledged safety problems and gang violence in Guatemala's prisons, but said those dangers arose from "negligence" and "a lack of resources," and thus were not the result of "state action" as required to establish "torture" under the regulations. *Id.*

On appeal, B.G.S. primarily argues that the IJ and BIA did not properly analyze whether he would be tortured by MS-13 in a Guatemalan prison and whether the Guatemalan government would acquiesce to that torture.

## DISCUSSION

Where, as here, the BIA does not "expressly adopt the IJ's decision" but "closely tracks the IJ's reasoning," we often review the opinions of both the IJ and the BIA "for the sake of completeness." *Wangchuck v. Department of Homeland Security, Immigration & Customs Enforcement*, 448 F.3d 524, 528 (2d Cir. 2006).[5],[6] We review factual findings for substantial evidence, and we review questions of law and the application of law to fact *de novo*, meaning without deference to the Agency's reasoning. *Hong Fei Gao v. Sessions*, 891 F.3d 67, 76 (2d Cir. 2018).

To qualify for relief under CAT, B.G.S. must demonstrate that "it is more likely than not that he would be tortured if removed to" Guatemala, "though he

---

[5] In quotations from caselaw and the parties' briefing, this opinion omits all internal quotation marks, footnotes, and citations, and accepts all alterations, unless otherwise noted.

[6] It is well established that when the BIA affirms the IJ's decision and adopts the IJ's reasoning in doing so, we review the BIA and IJ's decisions together. *See, e.g.*, *Secaida-Rosales v. I.N.S.*, 331 F.3d 297, 305 (2d Cir. 2003). In *Wangchuck v. Department of Homeland Security*, we noted that it "is not entirely clear" whether we review both decisions when the BIA does not expressly adopt the IJ's decision but the BIA "closely tracks the IJ's reasoning." 448 F.3d 524, 528 (2d Cir. 2006). Without deciding whether reviewing both in tandem was necessary, we considered both opinions in that case "for the sake of completeness." *Id.* We have since reviewed both the IJ and BIA opinions together when, like here, the BIA's opinion follows the IJ's reasoning. *See, e.g.*, *Alvarez v. Garland*, 33 F.4th 626, 638 (2d Cir. 2022).

13

need not draw a nexus between the alleged torture and [his] membership in a protected group." *Chen v. Garland*, 75 F.4th 109, 113 (2d Cir. 2023). Specifically, B.G.S. "bears the burden of proving" that "he more likely than not would be tortured by, or with the acquiescence of, government officials acting in an official capacity." *Quintanilla-Mejia v. Garland*, 3 F.4th 569, 592 (2d Cir. 2021).

This showing "boils down to a two-step inquiry." *Garcia-Aranda v. Garland*, 53 F.4th 752, 758 (2d Cir. 2022). First, B.G.S. must "show that, in [B.G.S.'s] particular situation, it is more likely than not that he [ ] will be harmed upon removal in a way recognized by section 1208.18(a)," which defines "torture." *Id.* That is, he must show that he will more likely than not be subject to "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . intimidating or coercing him or her or a third person." 8 C.F.R. § 1208.18(a)(1). In assessing the likelihood of future harm, the Agency must consider "all evidence relevant to the possibility of future torture," which includes but is not limited to: "(i) [e]vidence of past torture . . .; (ii) [e]vidence that the applicant could relocate . . . ; (iii) [e]vidence of gross, flagrant or mass violations of human rights . . .; and (iv) [o]ther relevant information regarding conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3).

The second step requires B.G.S. to show that "sufficient state action . . . would be involved in his [ ] likely future harm." *Garcia-Aranda*, 53 F.4th at 759. Meaning, B.G.S. must show that any torture would occur "at the instigation of" or "with the consent *or acquiescence of*" a person "acting in an official capacity." 8 C.F.R. § 1208.18(a)(1) (emphasis added). Acquiescence is "demonstrated by evidence that government officials know of or remain willfully blind to an act of torture and thereafter breach their legal responsibility to prevent it." *Scarlett v. Barr*, 957 F.3d 316, 334 (2d Cir. 2020); *see also De La Rosa v. Holder*, 598 F.3d 103, 109 (2d Cir. 2010) ("[W]e have held that torture requires only that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it."). If B.G.S. can establish both prongs, CAT relief is mandatory, not discretionary. *See* 8 C.F.R. § 1208.16(c)(4).

There are two forms of relief under CAT: (1) withholding of removal and (2) deferral of removal. 8 C.F.R. § 1208.16(c)(4). The standards for establishing both are the same. *Id.* But, an applicant is ineligible for withholding of removal if, among other things, he has committed "a serious nonpolitical crime" outside of the United States, *Guo Qi Wang v. Holder*, 583 F.3d 86, 90 (2d Cir. 2009), has been convicted of a "particularly serious crime" domestically, or has been deemed a danger to the security of the United States, 8 C.F.R. § 1208.16(d)(2); 8 U.S.C.

15

§ 1231(b)(3)(B).  In contrast, deferral of removal is a "less permanent form of protection than withholding of removal" and "is more easily and quickly terminated[.]"  64 Fed. Reg. 8480 (1999).  Accordingly, consistent with CAT's goal of ensuring an individual is not "returned to a country where they would be tortured," an individual can still be eligible for deferral of removal even if they have committed a serious crime.  *Id.* at 8481; *see also* 8 C.F.R. §§ 1208.16(c)(4), 1208.17(a).  B.G.S. seeks only deferral of removal under CAT.

On appeal, B.G.S. argues that the Agency "applied the wrong legal standards to the wrong theory of torture" in analyzing his claim that he would likely be tortured by MS-13 in a Guatemalan prison.  Petitioner's Br. at 20.  Specifically, he argues that the Agency failed to properly analyze whether *members of MS-13* or other gangs would harm him with the government's acquiescence upon his likely incarceration in Guatemala.  We agree.[7]

Before the Agency, B.G.S. argued, among other things, that he would likely be incarcerated upon his return to Guatemala; MS-13 members or members of a rival gang within the prison would likely target him for violence—either as

---

[7] The government argues that B.G.S. did not administratively exhaust this argument below.  But, B.G.S. argued before the BIA that the IJ erred in considering the harm to B.G.S. only from poor prison conditions and not also whether the Guatemalan government will allow him to be harmed by gang members while imprisoned.  That is sufficient to allow for our consideration on appeal. *See, e.g., Gill v. I.N.S.*, 420 F.3d 82, 85-86 (2d Cir. 2005).

retribution by MS-13 for leaving the gang and trying to cover his MS-13 tattoo, or as punishment by a rival gang for his association with MS-13; and that these private acts of torture would be met with government acquiescence. In response, both the IJ and BIA acknowledged the likelihood that B.G.S. would be arrested if he returned to Guatemala, but both their analyses focused only on whether the general prison conditions in Guatemala rose to the level of torture or merely resulted from a lack of resources or negligence.

It is true that "[t]he failure to maintain standards of diet, hygiene, and living space in prison does not constitute torture under the CAT unless the deficits are sufficiently extreme and are inflicted . . . intentionally rather than as a result of poverty, neglect, or incompetence." *Pierre v. Gonzales*, 502 F.3d 109, 121 (2d Cir. 2007). But, the question of whether a government's failure to maintain basic conditions of imprisonment itself constitutes torture is distinct from the question whether the government *acquiesces* to torture by a private actor. B.G.S.'s evidence and arguments implicated the latter question, which the Agency did not address.

We have recognized that a private actor's conduct may constitute torture under CAT if the private actor has a specific intent to inflict it and, even if the government does not share that intent, "a government official is aware of the persecutor's conduct and intent and acquiesces in violation of the official's duty to

17

intervene." *Pierre*, 502 F.3d at 118; *see also Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004), *as amended* (Apr. 12, 2004) ("In terms of state action, torture requires only that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it."). "Acquiescence is distinct from the specific intent required of the torturer himself." *Scarlett*, 957 F.3d at 334.

*Scarlett* is instructive on the question of acquiescence. In that case, a former police officer who had fled Jamaica following death threats from gangs claimed relief under CAT. *Scarlett*, 957 F.3d at 322-23. He testified that when he sought police assistance, he was told there were "no resources" to help him. *Id.* at 323. In assessing his claim, neither the BIA nor the IJ addressed "what legal responsibility Jamaican authorities had to protect a serving police officer threatened with gang violence," nor "how, if at all, evidence that Jamaican authorities were unable to fulfill their legal responsibility of protection might inform a determination about their acquiescence in threatened torture." *Id.* at 335. Because of these omissions, we granted the petition for review and remanded the petitioner's CAT claim because we could not "conclude on the existing record that the agency gave reasoned consideration to all relevant evidence and all principles of law applicable to determining government acquiescence in such torture." *Id.* at 336.

And, in *Garcia-Aranda*, we granted a petition for review and remanded for further consideration where the Agency failed to consider whether

> it is more likely than not (1) that the gang will intentionally inflict severe pain or suffering to intimidate or coerce [the petitioner], including meeting all the harm requirements for torture under section 1208.18(a); and (2) that local police acting under color of law will either (i) themselves participate in those likely gang actions or (ii) *acquiesce in those likely gang actions*.

53 F.4th at 760 (emphasis omitted & added).

Similarly, here, neither the BIA nor the IJ analyzed whether gang members would attack B.G.S. in prison and whether the Guatemalan officials would be aware of such persecution and "acquiesce[] in violation of [their] duty to intervene." *Pierre*, 502 F.3d at 118.[8] The IJ considered only whether corruption generally existed in Guatemala and whether there was governmental acquiescence

---

[8] In concluding that B.G.S.'s testimony was credible but not persuasive, the IJ explained that B.G.S.'s testimony as to how MS-13 would find him if he returned to Guatemala was "speculative." CAR 139. Setting aside the tension between expecting B.G.S. to answer a question that inevitably requires some educated speculation—how he would be located upon his return—and then penalizing him for speculating in his answer, we note that the IJ's persuasiveness determination as to B.G.S.'s risk of harm in Guatemala generally does not address the more specific scenario, supported by other evidence, that B.G.S. would be imprisoned upon his return and identified as a former MS-13 member within the prison. That other evidence includes photographs of B.G.S.'s tattoos, portions of Rosen's expert report concerning the tattoos and gang violence in prison, and academic sources, which are largely independent from the testimony that the IJ did not find persuasive. It also includes evidence that after B.G.S. left Guatemala, Black Demon told one of B.G.S.'s brothers that "if they find [B.G.S.] they will kill him" as well as evidence that Sandoval, a Guatemalan police officer, told B.G.S.'s other brother that he was putting a cash bounty on B.G.S. and "would reward whoever found [B.G.S.] with 50,000 quetzales." CAR 135.

19

to harm to prisoners arising from the fact that "prisons are extremely overcrowded and conditions are 'harsh and life threatening.'" CAR 146. But the IJ's discussion did not address—applying the proper standard—B.G.S.'s argument that he was likely to be imprisoned upon his return to Guatemala and that, once in prison, the government would acquiesce to his torture by gang members targeting him for his attempt to leave the gang. While the BIA did acknowledge the risk of gang violence in prison, it did so only when considering whether the decision to incarcerate B.G.S. would demonstrate that the government "specifically intended to inflict severe physical or mental pain or suffering," rather than whether the government would *acquiesce* to any such torture by private actors in prison. CAR 7. It's not enough to describe the risk of harm B.G.S. would face in prison as the product of "negligence and lack of resources." CAR 146. Because that harm would arise from a serious threat of torture by third parties, rather than, say, challenging living conditions, the Agency was required to grapple with Guatemalan officials' duty to protect B.G.S. in prison and the implications of its inability to do so. *Scarlett*, 957 F.3d at 335. Indeed, the government acknowledged at oral argument that the IJ confused the legal standard. *See* October 30, 2024 Oral Argument at 17:19–30 (noting that "the immigration judge did somewhat conflate the prison standards versus whether the gang specifically would harm [B.G.S.]").

The Agency failed to consider the likelihood of torture in prison despite the evidence suggesting that B.G.S. would likely be arrested upon his return and that B.G.S. could be at risk of death by gang members in prison because of his recognizable tattoo revealing both his prior membership in MS-13 and his decision to leave the gang. *See Manning v. Barr*, 954 F.3d 477, 486 (2d Cir. 2020) (granting petition for review where "[t]he IJ and BIA . . . ignored substantial and material evidence that [the applicant] is likely to be killed if removed to [his home country]").

And it failed to assess whether, against this backdrop, Guatemalan officials would know that B.G.S. is a target for violence *in prison* (or would remain willfully blind to the risk); whether they have a legal duty to intervene to prevent such violence; and whether they would likely intervene.

We recognize that the Agency found Rosen's testimony unpersuasive insofar as it was too vague in explaining how MS-13 would find and attack B.G.S. upon his return to Guatemala *generally*; but, as noted above, that critique does not apply to Rosen's report and testimony concerning whether B.G.S. is likely to be imprisoned, whether gang members in prison will likely identify him as someone who left MS-13, and whether the Guatemalan government will acquiesce to such gang violence.

21

Accordingly, we grant B.G.S.'s petition for relief and remand to the agency to address these questions and to consider whether, in light of B.G.S.'s tattoos visibly establishing both his association with MS-13 and his break with the gang, the pending arrest warrant, as well as any other relevant evidence in the record, he has proven that it is more likely than not that he will be tortured by gang members in prison *with the acquiescence* of Guatemalan officials. *See De La Rosa*, 598 F.3d at 110 ("In light of the Court's concern with the BIA's application of the 'government acquiescence' legal standard, we find it appropriate to remand the instant case for additional analysis and discussion of that question.").

In evaluating acquiescence, the Agency should be mindful that "the preventative efforts of some government actors" does not "foreclose the possibility of government acquiescence, as a matter of law, under the CAT." *Id*. at 110. That is,

> Where a government contains officials that would be complicit in torture, and that government, on the whole, is admittedly incapable of actually preventing that torture, the fact that some officials take action to prevent the torture would seem neither inconsistent with a finding of government acquiescence nor necessarily responsive to the question of whether torture would be inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*Id.* Upon remand, in analyzing B.G.S.'s CAT claim under the proper government acquiescence standard, the Agency should also consider whether the Guatemalan government's efforts to combat gang activities "override[] both the complicity of other government actors and the general corruption and ineffectiveness of the [Guatemalan] government" in preventing gang violence in prison.[9] *Id.*

---

[9] The Agency found the testimony of B.G.S., his brother, and his mother to be "credible" but not "persuasive[]." CAR 139–40. B.G.S. argues that the Agency essentially made adverse credibility determinations under the guise of "persuasiveness" determinations. *See Garland v. Ming Dai*, 593 U.S. 357, 371 (2021) (explaining that the Immigration and Nationality Act "expressly distinguishes between credibility, persuasiveness, and the burden of proof"). Though credibility and persuasiveness may be "closely bound" concepts, *id.* at 371, the distinction between the two matters. That is, when an IJ makes an adverse credibility finding, the IJ must provide "specific, cogent reasons" for the finding. *Hong Fei Gao v. Sessions*, 891 F.3d 67, 77 (2d Cir. 2018). And, if the IJ does *not* make an adverse credibility finding, the applicant is entitled to a presumption of credibility on appeal to the BIA. *Ming Dai*, 593 U.S. at 367 ("The IJ—who actually observes the witness—is best positioned to assess the applicant's credibility in the first instance. The credibility presumption encourages the IJ to make specific findings about credibility."). As to its conclusion that B.G.S.'s testimony was not persuasive, the IJ explained that B.G.S. testified at the hearing that Black Demon "shot him" but, in his written statement submitted prior to the hearing, stated only that Black Demon "shot at him." CAR 138. Credibility should be based on "the totality of the circumstances," including "the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements . . ., the internal consistency of each such statement, the consistency of such statements with other evidence of record . . ., and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor." 8 U.S.C. § 1229a(c)(4)(C). Insofar as the Agency relied on inconsistencies like this to support its determination that B.G.S.'s (and others') testimony was not persuasive, its determinations appear to be adverse credibility determinations, even if denominated otherwise. On remand, the Agency should clarify the nature of and basis for its determination about the testimony of B.G.S. and his supporting witnesses.

## CONCLUSION

For these reasons, we **GRANT** B.G.S.'s petition for review, **VACATE** the Agency's denial of relief under CAT, **REMAND** for further proceedings consistent with this decision, and **VACATE** the pending stay.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

I cannot agree with the majority "that the Agency failed to properly analyze whether members of MS-13 or other gangs would harm [B.G.S.] with the government's acquiescence upon his likely incarceration in Guatemala." Maj. Op. at 16 (emphasis omitted). In fact, both the IJ and BIA expressly considered whether B.G.S. had shown that Guatemalan officials would acquiesce in his torture at the hands of gang members in prison – and concluded that he had not. Because the administrative record does not compel a different conclusion, we are obliged to deny the petition. *See Singh v. Bondi*, 139 F.4th 189, 197 (2d Cir. 2025) (explaining that the Agency's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary" (quoting 8 U.S.C. § 1252(b)(4)(B))). I therefore respectfully dissent from the majority's decision to remand this case for further findings by the Agency.

According to the majority, the Agency's analysis was improper because it "focused only on whether the general prison conditions in Guatemala rose to the level of torture or merely resulted from a lack of resources or negligence." Maj. Op. at 17. "[N]either the BIA nor the IJ," the majority says, "analyzed whether gang members would attack B.G.S. in prison and whether the Guatemalan officials

would be aware of such persecution and acquiesce in violation of their duty to intervene." *Id.* at 19 (alterations adopted and internal quotation marks omitted). Thus, the majority concludes that the Agency "failed to assess whether . . . Guatemalan officials would know that B.G.S. is a target for violence in prison (or would remain willfully blind to the risk)." *Id.* at 21 (emphasis omitted).

That is not a fair reading of the IJ's and BIA's decisions. To begin, the IJ correctly observed that "[t]orturous conduct can either be committed directly by public officials or by private individuals the authorities acquiesce to." Cert. Admin. R. at 142. And the IJ specifically acknowledged that "[a]cquiescence of a public official requires that the official have awareness of or remain 'willfully blind' to the activity constituting torture prior to its commission, and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* (citing 8 C.F.R. § 1208.18(a)(7)). The IJ then applied those rules to B.G.S.'s assertion that he would be tortured in prison by MS-13 or other gang members. The IJ explained that while B.G.S.'s open arrest warrant for murder increases the likelihood of his incarceration upon his return to Guatemala, the record does not support the proposition that any risk of harm from other inmates stems from the government's willful blindness, as opposed to "prison official negligence and lack

2

of resources." *Id.* at 146 ("[W]hile there is certainly a risk [B.G.S.] would be harmed in prison, it is not clear from this record that the Guatemalan government is willfully blind to this harm rather than lacking resources."). The IJ therefore explicitly found that "the record does not demonstrate that the Guatemalan authorities would *acquiesce* to any potential torture" of B.G.S. – whether in prison or otherwise. *Id.* (emphasis added).

The BIA echoed the IJ's analysis on appeal. First, the BIA accurately observed that the IJ "found that [B.G.S.] did not establish that any harm he will experience in prison will be by or with the consent or acquiescence of the Guatemalan government." *Id.* at 7. The BIA then acknowledged B.G.S.'s evidence regarding "overcrowding and inadequate conditions within Guatemala's prisons . . ., resulting in safety and control problems *and gang violence*." *Id.* (emphasis added). The BIA concluded, however, that such "instances of violence . . . within Guatemalan prisons are the result of negligence." *Id.* The BIA therefore agreed with the IJ that Guatemala's "difficulties controlling gangs" within its prison system, in addition to not constituting torture by the government itself, is *also* "insufficient to demonstrate 'acquiescence' for CAT purposes." *Id.*

Put simply, the majority ignores what the Agency actually said. The IJ's and BIA's analyses were not limited to "whether a government's failure to maintain basic conditions of imprisonment itself constitutes torture." Maj. Op. at 17. In reality, the Agency expressly found that because the problem of gang violence in Guatemala's prisons – the source of potential torture that B.G.S.'s argument relies on – results from negligence and a lack of resources rather than the Guatemalan government's willful blindness, B.G.S. failed to establish that Guatemalan officials would acquiesce to his torture in prison. *See* Cert. Admin. R. at 7. That conclusion is supported by substantial evidence, including the U.S. Department of State's human rights report for 2021 and the testimony of B.G.S.'s country conditions expert, Dr. Rosen, concerning Guatemala's "iron fist" policy for combatting gang violence. *See id.* at 798 (attributing Guatemalan prisoners' exposure to violence to "prison officials' negligence," not willfulness); *id.* at 800–01 (describing government efforts, albeit unsuccessful, to decrease gang violence in prison); *id.* at 348, 353-55 (Dr. Rosen describing Guatemala's "iron fist" policies). And our precedent, and the controlling regulations, make clear that "mistake, negligence, or even reckless disregard of truth are insufficient to demonstrate 'acquiescence'

4

in torture." *Quintanilla-Mejia v. Garland*, 3 F.4th 569, 594 (2d Cir. 2021) (citing 8 C.F.R. § 1208.18(a)(7)).

*       *       *

For these reasons, I respectfully dissent from the majority's conclusion that the Agency failed to analyze whether the Guatemalan government would acquiesce to B.G.S.'s torture in prison. And because I find his remaining arguments equally unavailing, I would deny his petition for review.